**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**GEOTEK et al., Defendants.**

**No. 73 0819 WTS.**

United States District Court,
N. D. California.

Nov. 11, 1976.

Theodore Sonde, Robert M. LaPrade, Arne R. Rode, Fred Krieger, Washington D. C., Stephen Jan Meyers, Edward V. O'Gara, Jr., San Francisco, Cal., for plaintiff.

M. Laurence Popofsky, Douglas M. Schwab, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., and Paul J. Bschorr, Vincent R. Fitzpatrick, Jr., Diana Elzey Pinover, White & Case, New York City, for defendants, Arthur Young & Company, Douglas F. Page, Kenneth L. Kost, Thomas W. Orr and George Steven Burrill.

James Martin MacInnis and Stephen Zalkind, San Francisco, Cal., for defendants, Jack Burke and Burke related companies.

## MEMORANDUM OF DECISION AS TO JACK BURKE DEFENDANTS AND ARTHUR YOUNG & COMPANY DEFENDANTS WITH SUMMARY OF SEPARATELY FILED SPECIFIC FINDINGS AND CONCLUSIONS AS TO SAID DEFENDANTS

SWEIGERT, District Judge.

After trial of the above case before the Court without a jury, the Court, having previously rendered an oral decision from the bench as to Jack Burke and the Jack Burke-controlled defendant companies which were directly involved in the JB and Geotek programs (hereinafter referred to collectively as "the Jack Burke defendants"); [1] and as to Arthur Young & Company and four individual Arthur Young & Company Certified Public Accountants (hereinafter referred to collectively as "AY"),[2] now files this Memorandum of Decision elaborating on that oral decision and including herein a summary of its separately filed "Specific Findings and Conclusions re Jack Burke Defendants and Arthur Young & Company Defendants", with references thereto.

The Court has found against the Jack Burke defendants on some issues and in their favor on others. (See p. 728, infra).

The Court has found in favor of the Arthur Young & Company defendants on all issues. (See p. 730, infra).

---

[1]. The Jack Burke-controlled companies named as defendants herein include: JB Oil Company; the Fundamental Oil Company; Geotek Resources Fund, Inc.; GTR Management Company, Inc.; Charter Street Corporation; and Citrix Oil Company. The only one of these companies which was *not* directly involved in the JB or Geotek programs is the Citrix Oil Company. The term "Jack Burke defendants", therefore, as that term is used herein, refers to Jack Burke and all of the above-named companies, *except* the Citrix Oil Company.

## BACKGROUND AND STATUS OF THE LITIGATION

For a better understanding of the issues considered in this Memorandum of Decision and in the separately filed Specific Findings and Conclusions, we first set forth a brief statement concerning the background of the case.

During the 1960's defendant Jack Burke began to form a number of investment programs for the purpose of exploring and drilling for oil and gas. The first series of such programs were joint ventures, known as the JB–64, JB–65, JB–66, JB–67 and JB–68 Oil Exploration Programs, in which defendant JB Oil Company, a corporation owned and controlled by Jack Burke, served as manager and in turn contracted with defendant The Fundamental Oil Company (hereinafter "Fundamental"), also a corporation owned and controlled by Jack Burke, to serve as operator of the programs.

In September, 1969, an exchange offer was made pursuant to which investors in the JB–64, JB–65, JB–66 and JB–67 programs exchanged their interests in those programs for corporate shares in defendant Petroleum 2000 Corporation (hereinafter "P–2000"). In October, 1970, investors in the JB–68 program exchanged their interests in that program for corporate shares in defendant Petroforce Corporation (hereinafter Petroforce).

Since these JB programs were intended for only intra-state investment, interests in them were sold under permits obtained from the California Corporation Commissioner, without any registration with the SEC.

The SEC, however, has entered into consent judgments with all of these "Jack Burke defendants" except Jack Burke, JB Oil Company and Charter Street Corporation. Accordingly, this decision is directly applicable only to those three Jack Burke defendants.

[2]. The four individual Arthur Young & Company Certified Public Accountant Defendants are: Douglas F. Page, Kenneth L. Kost, Thomas W. Orr and George Steven Burrill.

In 1969, Burke began another series of programs which were limited partnerships and were known as the Geotek 69–1, 70–1, 70–2, 71–1 and 71–2 programs. In these programs Geotek Resources Fund, Inc., (hereinafter "GRF"), a corporation owned and controlled by Jack Burke, was named as the general partner, and it in turn contracted with GTR Management Company, Inc., (hereinafter "GTR"), a corporation also owned and controlled by Jack Burke, to serve as manager of the programs.[3] GTR, in turn, utilized Fundamental for various purposes in furthering oil and gas exploration, property acquisitions and operations on behalf of the Geotek programs. The Geotek limited partnerships were sold both within and without the State of California and were for that reason registered with the SEC.

In 1969, defendants Jack Burke and Percy Goodwin sold in the State of Washington interests in two other California limited partnerships—Hydrocarbon Associates, Ltd., (hereinafter "Hydro") and Petro Development Associates, Ltd., (hereinafter "Petro"). In both of these programs Percy Goodwin appeared as the general partner along with the Citrix Oil Company, a corporation wholly owned and controlled by Jack Burke. In October, 1970, investors in these Hydro and Petro programs exchanged their program interests for corporate shares in defendant Washington Oil Investors, Inc., (hereinafter "Washington Oil").

By 1971, a total of approximately $30 million had been invested by the public in these three series of programs—$12 million by 379 investors in the JB programs; $17 million by 1200 investors in the Geotek programs; $600,000 by 21 investors in the Hydro program; and $400,000 by 16 investors in the Petro program.

## THE SEC INVESTIGATIONS

In January, 1970, the SEC, then having before it the matter of the clearance of certain registration materials for Geotek 69–1, made an order of investigation and, in the course of its investigation, concluded that the prospectus for that program did not adequately reflect Jack Burke's previous oil and gas affiliations. This matter was soon resolved by the SEC's acceptance of an offer from the Jack Burke defendants to issue voluntarily a modified prospectus for Geotek 69–1 and also to allow any Geotek 69–1 investor, who desired to do so, to rescind his investment.

In February, 1971, the SEC, then having before it the matter of the clearance of some proxy material prepared in connection with a proposed merger of the Geotek and other programs into corporate form with the Pacific Oil and Gas Company, made a second order of investigation and received from Jack Burke an affidavit dated January 28, 1972.

In this Jack Burke affidavit, which purported to disclose all his prior activities in the oil and gas business, Burke omitted to disclose his previous connection with four companies—Island Oil Corporation, Regent Oil Corporation, Northern Continental Petroleum Corporation and Ramada Drilling Company—which companies he had secretly set up, and which he owned and controlled through his brother Robert Burke. Thereafter, Jack Burke caused these companies to enter into certain transactions with Fundamental in its capacity as the Jack Burke-controlled operator of the JB programs.

Shortly after receiving this Jack Burke affidavit, the SEC happened to come upon information indicating to it for the first time a possible connection between Jack Burke and the Island Oil Corporation. When the SEC asked Burke to explain this connection, Burke, on February 14, 1972, confessed to his business associates and, in effect, to the SEC, his past connection with these so-called secret companies and the fact that his SEC affidavit was false in omitting to so show.

Thereafter, at the insistence of his business associates, Burke resigned all officerships and directorships which he had held in

---

**3.** At all times relevant to the SEC's claims herein, Jack Burke owned either all or more than 80% of the outstanding stock of GTR, and GTR, in turn, owned all of the outstanding stock of GRF.

the so-called Jack Burke-controlled companies. Subsequently, but prior to the filing of the instant action, Petroforce brought suit in California State Court against Jack Burke, the four so-called secret companies and other Burke-controlled companies, alleging improper dealings by those defendants with the JB programs—a lawsuit that has not been prosecuted.

## THE PENDING ACTION

In May, 1973, the SEC brought this civil action under the federal securities acts (15 U.S.C. §§ 78e and 77t(b)) against Jack Burke and others, alleging violations of several sections of the Securities Acts (15 U.S.C. §§ 77g(a); 78g(b); 78n(a); and 78o (d)) and seeking the injunctive relief authorized by 15 U.S.C. §§ 78e and 77t(b).

In this action, the SEC has included as defendants, not only Jack Burke and the so-called Jack Burke-controlled companies, but also the so-called investor-controlled entities. This latter group includes P–2000, Petroforce, and Washington Oil.[4]

In addition to the above-named defendants, the SEC also joined other defendants who, according to SEC, have allegedly violated the securities acts by participating with and aiding Jack Burke and the Jack Burke-controlled companies to violate those acts.

Among these additional defendants are the Arthur Young & Company defendants ("AY")—the nationally based certified public accounting firm and its four individual accountants—which defendants had been engaged by the Jack Burke defendants to perform certain auditing services for the JB and Geotek programs; also Robert Burke, Jack Burke's brother and an officer of certain of the above-mentioned so-called secret companies; Arthur Lempert, one of the attorneys for Jack Burke and the Burke-controlled companies, and an officer of GRF and GTR; Jacqueline Aldrich, a bookkeeper-accountant who was an officer of Fundamental, P–2000, Petroforce, GRF and GTR; Percy Goodwin, a securities salesman asso-

ciated with Jack Burke in the sale of Petro and Hydro interests in the State of Washington and a general partner of those two programs; and Robert Mount, an associate of Jack Burke, who sold interests in the JB programs and was an officer of Fundamental, JB Oil Company, P–2000, Petroforce, Charter Street, GRF and GTR.

## THE PRELIMINARY INJUNCTION

On October 9, 1973, the SEC sought a preliminary injunction in this case upon the ground that it appeared likely that, unless preliminarily enjoined, Jack Burke, although resigned from his officerships and directorships, might still control or attempt to influence or control the Geotek programs. On that same day, October 9, 1973, this Court issued its Memorandum of Decision and Order enjoining any such Burke control, and, because it then also appeared likely that there had been a commingling of assets and liabilities of and between the various programs, the Court also appointed a receiver for Fundamental, GRF, GTR and the individual Geotek programs.

All five of the Geotek programs have since been operating through the receiver. Neither the JB programs (now P–2000 and Petroforce) nor the Hydro and Petro programs (now Washington Oil) were placed in the receivership.

## THE CRIMINAL PROSECUTION

In June, 1974, a criminal indictment was returned in this court charging Jack Burke with violations of 15 U.S.C. §§ 77q(a) and 77x (fraud in the sale of securities); 18 U.S.C. § 1341 (mail fraud); and 18 U.S.C. § 1001 (false statements); and also charging Jack Burke, Arthur Lempert and Robert Rose (an attorney and officer of both GRF and GTR) with violation of 18 U.S.C. § 371 (conspiracy). In the course of a jury trial on those charges, defendant Jack Burke changed his plea to a plea of guilty to violation of 18 U.S.C. § 1001—a charge arising out of the false affidavit above-mentioned. Thereupon, on January 20,

---

**4.** The Geotek 69–1, 70–1, 70–2, 71–1 and 71–2 limited partnerships were also among the investor-controlled entities originally named as defendants, but those programs have since entered into a consent judgment with the SEC and have been dismissed from this action.

1975, Jack Burke was sentenced to 30 months imprisonment and a fine was imposed in the amount of $5,000.

No criminal convictions were ever obtained against Burke on the fraud and conspiracy charges, and defendants Lempert and Rose were acquitted on motions granted by the Court.

## THE TRIAL OF THIS CIVIL ACTION AND PRESENT STATUS

In June, 1975, the pending civil case came on for a long and complex trial before this Court, sitting without a jury, for 34 court days during which 30 witnesses were heard and approximately 760 exhibits were introduced. Upon completion of the SEC case in this trial in October, 1975, motions were made by all defendants under Rule 41(b), Fed.R.Civ.P. to dismiss the action.

As to defendant Jack Burke, the case is now ready for judgment upon the trial record—supplemented by an offer of proof of certain further facts filed December 15, 1975.

As to the AY defendants, the Court heard their defensive evidence (except for certain evidence relating to their affirmative defenses) and on that record the case is also ready for judgment as to AY.[5]

## THE APPLICABLE LAW—SCIENTER

Before summarizing the Court's separately filed Specific Findings and Conclusions with respect to the SEC charges against the Jack Burke defendants and AY, we set forth the legal standard by which the conduct of those defendants has been judged.

The SEC brings this statutory enforcement action under the federal securities laws, charging that the Jack Burke defendants made material misstatements and/or omissions in the JB and Geotek program "basic documents"[6] and also in certain of the JB and Geotek program receipts and disbursements financial statements. The SEC also charges that AY made material misrepresentations and/or omissions in its audit report certifications of those JB and Geotek program financial statements.

Since the JB programs were never registered with the SEC, the SEC's claims with respect to those programs are based only upon Section 17(a) of the Securities Act of

---

5. Neither this Memorandum of Decision nor the Court's separately filed Specific Findings and Conclusions, dealing only with the SEC's claims against the Jack Burke and AY defendants in connection with the JB and Geotek programs, cover the SEC's claims as hereinafter listed. The Court reserves power to conduct further proceedings and to make separate Findings and Conclusions concerning those claims, which are as follows:

As to defendant Robert Burke:
 SEC claims re JB programs
As to defendant Arthur Lempert:
 SEC claims re JB and Geotek programs
 SEC claims re P–2000, Petroforce & Washington Oil exchange offers
 SEC claims re failure to register JB offerings
As to defendant Jacqueline Aldrich:
 SEC claims re JB and Geotek programs
 SEC claims re P–2000, Petroforce & Washington Oil exchange offers
As to defendant Robert Mount:
 SEC claims re JB programs
 SEC claims re failure to register JB offerings
As to defendant Percy Goodwin:
 SEC claims re Hydro and Petro offerings
 SEC claims re failure to register Petro and Hydro offerings
As to defendant Citrix Oil Co.:
 SEC claims re Petro and Hydro programs

SEC claims re exchange offers re Washington Oil
SEC claims re failure to register Petro and Hydro offerings
As to defendant P–2000:
 SEC claims re P–2000 exchange offer
As to defendant Petroforce:
 SEC claims re Petroforce exchange offer
As to defendant Washington Oil:
 SEC claims re Washington Oil exchange offer
As to defendant JB Oil Co.:
 SEC claims re P–2000 and Petroforce exchange offers
 SEC claims re failure to register JB offerings
As to defendant Jack Burke:
 SEC claims re Petro and Hydro programs
 SEC claims re P–2000, Petroforce and Washington Oil exchange offers
 SEC claims re failure to register JB, Petro and Hydro offerings

6. The "basic documents" for the JB programs consist of the JB Offering Circulars and Oil Exploration Program Agreements (Exhibits 10A–10E and 11A–11E); the "basic documents" for the Geotek programs consist of the Prospectuses, Limited Partnership Agreements, and Management Agreements (Exhibits 12–17).

1933 (15 U.S.C. § 77q(a)) and Section 10(b)/Rule 10b–5 of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)/17 CFR 240.10b–5.[7]

The Geotek programs, however, were registered with the SEC, and the SEC's claims with respect to those programs are based, not only on Sections 17(a) and 10(b)/10b–5, but also upon Sections 14(a) and 15(d) of the 1934 Act. (15 U.S.C. §§ 78n(a), 78o(d)).

The Supreme Court in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), has held that proof of ordinary negligence is insufficient to establish liability in a private Section 10(b)/Rule 10b–5 damage action. The Court noted in *Hochfelder* that Section 10(b) expressly makes unlawful the use or employment of "any manipulative or deceptive device or contrivance" in contravention of SEC rules, and, upon a review of the legislative history of that language, the Court held that some type of "scienter" is required to establish 10(b)/10b–5 private action liability. For the purposes of its decision the Court defined "scienter" as "intent to deceive, manipulate or defraud" and declined to decide whether, in some circumstances mere "reckless" behavior would be sufficient to establish liability under 10(b)/10b–5. (425 U.S. at 193, n. 12, 96 S.Ct. 1376). In so ruling, the Court rejected and overruled the Ninth Circuit's "flexible duty standard", insofar as that standard permitted the establishment of 10(b)/10b–5 liability for mere negligent conduct which was in breach of a duty of ordinary or even extreme care. (See, e. g. *White v. Abrams,* 495 F.2d 724 (9th Cir. 1974)).

In *Hochfelder,* however, the Court expressly declined to consider the question herein presented—i. e., whether the same "scienter" now required in a private

10(b)/10b–5 damage action is also required in a 10(b)/10b–5 statutory enforcement action brought by the SEC. (425 U.S. at 193 n. 12, 96 S.Ct. 1376).[8]

Prior to the Supreme Court's decision in *Hochfelder,* the degree of culpability required to establish liability in a 10(b)/10b–5 SEC enforcement action was established by a majority of cases to be "negligence" or the "lack of due diligence." *SEC v. Management Dynamics, Inc.,* 515 F.2d 801 (2d Cir. 1975); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 854–855 (2d Cir. 1968); *SEC v. Spectrum, Ltd.,* 489 F.2d 535, 541 (2d Cir. 1973); *SEC v. Dolnick,* 501 F.2d 1279 (7th Cir. 1974); *SEC v. Van Horn,* 371 F.2d 181 (7th Cir. 1966). *Contra, SEC v. Coffey,* 493 F.2d 1304 (6th Cir. 1973).

Section 17(a), although substantially similar to Section 10(b)/10b–5, does not contain the specific language of Section 10(b) relied upon in *Hochfelder* to require proof of "scienter" in private 10(b)/10b–5 actions and was not specifically discussed by the Supreme Court in *Hochfelder.* Nor did the Supreme Court indicate in *Hochfelder* whether "scienter" is a required element of proof in an SEC enforcement action brought for violations of Sections 14(a) and 15(d) of the 1934 Act.

For the purposes of this action, however, we have decided to apply the strict standard of negligence (i. e., ordinary care or due diligence) as to all SEC claims against defendants.

## APPLICABLE LAW—APPROPRIATENESS OF INJUNCTIVE RELIEF

In addition to determining whether the SEC has established the requisite degree of culpability in an SEC enforcement action, it is clearly established that, in such an action, the Court must also further

---

7. We do not in this Memorandum of Decision render any decision with respect to the SEC's claims brought against Jack Burke or any other defendants under Section 5 of the 1933 Act (15 U.S.C. §§ 77e(a) and (c)) for failure to register the JB program offerings with the SEC. (See note 5, supra).

8. In at least one case decided by a district court since the Supreme Court's decision in *Hochfelder,* it has been held that "scienter" must be established in a 10(b)/10b–5 SEC enforcement action and that proof of mere negligence is not enough. *SEC v. Bausch & Lomb, Inc.,* 420 F.Supp. 1226 (S.D.N.Y., 1976).

determine whether, as a matter of equity, the issuance of a statutory injunction is appropriate. This equitable determination is one which must be made individually in each case. The standard upon which the Court must base its decision is whether there is a "reasonable likelihood" or "expectation" that the defendant will commit further violations of the securities laws in the future. *SEC v. Texas Gulf Sulphur Co.*, 258 F.Supp. 262 (SDNY 1966), remanded 401 F.2d 833 (2d Cir. 1968), dec. on remand 312 F.Supp. 77 (SDNY 1970); *SEC v. Manor Nursing Centers Inc.*, 458 F.2d 1082 (2d Cir. 1972); *SEC v. Harwyn Industries Corp.*, 326 F.Supp. 943 (SDNY 1971). See also, *Hecht Co. v. Bowles*, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *SEC v. W. T. Grant*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1952).

## GENERAL FINDINGS AS TO THE JACK BURKE DEFENDANTS

It should first be noted that the oil and gas exploration programs initiated by Jack Burke were not empty shells. All of the JB and Geotek programs have been and now are operating entities with substantial oil and gas properties in various states of actual or potential production; all have substantial income and, of course, debts, but none has ever been judicially found to be insolvent. Some problems have arisen, however, concerning the allocation by the Jack Burke-controlled corporate managers and operators of certain properties, credits and liabilities among the various programs.

It should also be noted that financial losses to investors attributable to Jack Burke's so-called secret dealings, if there were any such losses, were not anywhere near the $30 million which was in effect entrusted to him and his companies under the terms of the basic program documents.

As far as the Jack Burke defendants are concerned, we may generally state that, although we have found that in some matters there was deliberate failure to disclose certain material facts (e. g., Jack Burke's failure to disclose in financial statements that he had been dealing personally, or through Fundamental, with certain of his own secret companies), most of his alleged misstatements and omissions did not involve secret dealings.

Many of the charges against the Jack Burke defendants are to the effect that the JB and Geotek financial statements failed to disclose that these defendants were operating the programs in a manner unauthorized by or in contravention of the terms of the basic JB and Geotek documents.

Those basic JB and Geotek program documents, however, were so drawn as to vest wide, discretionary operating powers in known Jack Burke-controlled companies (e. g., JB Oil Company, Fundamental, GRF and GTR), and the SEC's charges concerning such allegedly unauthorized transactions call for a determination as to whether certain operations were (or were not) authorized within the meaning of the basic documents.

Whatever may be said about the wisdom of granting such broad operating authorizations and powers as were granted in the JB and Geotek basic documents, it must be borne in mind that those powers and authorizations had been, nevertheless, disclosed to investors in the basic documents prior to investing in the programs and, further, that in the case of the Geotek programs, the prospectuses containing such broad powers and authorizations had all been cleared by the SEC, itself.

On the subject of the authority of GTR (the Jack Burke-owned and controlled Geotek manager) to deal with and through Fundamental (another Jack Burke-owned and controlled company) it must be borne in mind that Jack Burke had been widely publicized as the parent, promoter and founder of both the JB and the Geotek programs. The importance of Jack Burke's overall role in these programs was stressed not only in the basic program documents, but also, according to the evidence in this case, in the actual sales talks made to potential investors.

Most of the misrepresentations and/or omissions charged against the Jack Burke defendants were alleged misrepresentations

in or omissions from either the written JB and Geotek basic documents upon which interests in the programs were sold, or the programs' subsequently issued written receipts and disbursements financial statements. As to the AY defendants, any misrepresentations and/or omissions charged against them relate to AY's audit report certifications of those same written financial statements.

■ It should also be noted that, as far as the program financial statements and the AY certifications thereof are concerned, these were issued long after the initial public investments had been made in the various programs. Further, there is no evidence in the record showing that any of the Geotek financial statements, or the AY certifications thereof, were ever sent, either by management or by AY, to Geotek investors. The evidence shows only that they were used by the programs for attachment to the annual Form 10k reports filed with the SEC for each Geotek program.[9]

The SEC introduced some testimony of JB and Geotek investors for the purpose of showing that, in addition to such misrepresentations and omissions in the basic documents and financial statements, Jack Burke (along with defendants Percy Goodwin and Robert Mount) also made various *oral* misrepresentations in meetings with potential investors. This testimony, however, fell far short of supporting SEC charges concerning Jack Burke misrepresentations or nondisclosures concerning existing or past material facts. Most of this testimony had to do with conclusory or "puffing" statements upon which investors could hardly have relied and upon which most of the investor witnesses obviously did not rely.

These sales talks, as well as the written JB and Geotek program offerings, were directed for the most part to wealthy investors who could afford the risks of oil exploration programs and who might be at least as interested in income tax advantages as in prospective profits. The JB–65 through JB–68 program offering circulars expressly warned that "oil and gas ventures are speculative and that there was no assurance that oil or gas would be discovered in commercial quantities by the programs." (E. g., Ex. 10D, p. 3). Similarly, the cover page of the Geotek prospectuses contained a caption in large letters that "THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK," and also contained a disclosure that investment in the Geotek programs was recommended "only for persons who have income that is subject to the higher federal income tax rates and who may benefit from the tax treatment presently allowed such investments under the Federal Tax Laws." Additionally, the Geotek prospectuses contained a specific section titled "Risk factors", wherein reference was made to the speculative nature of oil and gas operations and exploration; Jack Burke's ownership and control of GRF, GTR and Charter Street; the possibility of financing the programs by borrowing; and the authorization to the programs to acquire properties from "affiliates, which could result in possible conflicts of interest." (E. g., Ex. 14, pp. 3–4).

SPECIFIC FINDINGS AND CONCLUSIONS SUMMARIZED—CHARGES AGAINST JACK BURKE DEFENDANTS

On the SEC charges concerning certain so-called unauthorized transactions, we have found against the Jack Burke defendants on some of these charges and in their favor as to the remainder. (See, Specific Findings and Conclusions—"I. Unauthorized Transactions").

For the purposes of this case, we have determined that the financial reports and audit report certifications were issued "in connection with" the sale of a security, within the Ninth Circuit's construction of that requirement in *Wessel v. Buhler*, 437 F.2d 279, 282 (9th Cir. 1971).

---

9. Both the Jack Burke and AY defendants have raised the question whether the allegedly false or misleading financial statements and audit report certifications, which were all issued subsequent to investment in the program upon which they reported, may be said to have been issued "in connection with" the sale of a security, within the meaning of Section 10(b)/10b–5.

Certain other SEC charges against the Jack Burke defendants are to the effect that, although these defendants did disclose certain affiliated property transfer and drilling contract transactions in the program financial statements, the disclosures were inadequate. We have found against the Jack Burke defendants on some of these charges and in their favor as to the remainder. (See Specific Findings and Conclusions—"II. Affiliated Property Transfers and Drilling Contracts").

Another SEC charge is to the effect that certain JB financial statements were in such form as to conceal from federal tax authorities the fact that the programs had enabled their individual investors to claim more advantageous tax deductions than those to which the investors were properly entitled. On these charges we have found in favor of the Jack Burke defendants. (See, Specific Findings and Conclusions— "III. Late Clearing Checks").

Another SEC charge is to the effect that in one of the JB financial statements costs relating to a certain oil property ("Tracy Mountain") were misleadingly described as costs relating to a "production property". On this charge we have found in favor of the Jack Burke defendants. (See, Specific Findings and Conclusions—"IV. Tracy Mountain").

Certain other SEC charges are to the effect that the Geotek basic documents and financial statements misstated and/or omitted certain material facts relating to the allocation, classification and estimation of overhead expenses. On these charges we have found in favor of the Jack Burke defendants. (See, Specific Findings and Conclusions—"V. Overhead Expenses").

Certain other SEC charges are to the effect that certain JB and Geotek financial statements did not adequately disclose all the material facts concerning certain bank loans obtained by Fundamental. On these charges we have found in favor of the Jack Burke defendants. (See, Specific Findings and Conclusions—"IV. Bank Loans").

Another SEC charge is to the effect that certain Geotek basic documents and finan-cial statements did not disclose that a certain transaction, which was otherwise authorized and fair, was made for the purpose of repaying a cash shortage owing to certain programs. On this charge we have found against the Jack Burke defendants. (See, Specific Findings and Conclusions— "VII. The Lost Creek-Million Dollar Shortage Transaction").

Another SEC charge is to the effect that the Jack Burke defendants failed to disclose in certain Geotek prospectuses that Jack Burke would receive more remuneration than was specified in the prospectuses. On this charge we have found in favor of the Jack Burke defendants. (See, Specific Findings and Conclusions—"VIII. Remuneration to Jack Burke").

Another SEC charge is to the effect that the Jack Burke defendants failed to comply with certain provisions in the JB basic documents concerning issuance of regular financial reports. On this charge we have found in favor of the Jack Burke defendants. (See, Specific Findings and Conclusions— "IX. Failure to Issue Regular Financial Statements").

With respect to the several charges as to which the Court has found *against* the Jack Burke defendants, the Court has further found that the misrepresentations and/or omissions were made by those defendants, not merely negligently due to their failure to use ordinary care, but deliberately and with intent to deceive—i. e., "scienter" within the meaning of *Ernst & Ernst v. Hochfelder, supra.*

## GENERAL FINDINGS AS TO AY DEFENDANTS

In 1966, AY was employed by the JB programs to issue audit report certifications of certain of the programs' receipts and disbursements financial statements. This audit work was undertaken by AY and continued for about five years. It involved, not only the original JB–64 and JB–65 partnerships which were in existence in 1966, but also the three subsequent JB programs (i. e., JB–66, JB–67 and JB–68) and three of

the five subsequent Geotek programs (i. e., Geotek 69–1, 70–1 and 70–2). Prior to certifying these JB and Geotek financial statements, which statements involved a total of nearly $30 million in transactions between the programs and their respective general partners, managers and operators, AY engaged in an extensive accounting examination involving an enormous amount of record vouching, as shown in AY's voluminous work papers.

These AY audit report certifications were in the usual form and certified that AY had examined the statement of the program's receipts and disbursements for the stated period; that its examination was made in accordance with generally accepted auditing standards, and, accordingly, included such tests of the accounting records and such other auditing procedures as AY considered necessary in the circumstances; and that, in AY's opinion, the statement presented fairly the receipts and disbursements of the particular program in conformity with generally accepted accounting principles.

It should also be noted that AY, in addition to strongly denying any deviation from accepted auditing standards, has from its very first appearance urged certain separate, so-called equitable affirmative defenses, asserting in effect, that the SEC included AY as a defendant herein, not in good faith on the merits, but for other ulterior purposes. For reasons hereinafter set forth, it is unnecessary to pass upon these or any other AY affirmative defenses.

If the legal standard applicable in SEC statutory enforcement cases were not still an open question, and if "scienter" (i. e., intent to deceive, manipulate or defraud) was clearly established as an essential element in an SEC Section 10(b)/10b–5 enforcement action, then AY would be entitled to an immediate dismissal from this case. There is not a scintilla of evidence that anything was misstated or omitted by AY in its audit report certifications con-

sciously, intentionally or with fraudulent purpose to decdive either investors, the SEC or anyone else.

The evidence is clearly to the effect that, if anything was misstated or omitted by AY in its audit certifications, it was done so in the good faith belief and judgment that AY was following generally accepted auditing standards; that AY utilized such tests of program-related accounting records as it considered necessary under the circumstances and that, in AY's professional opinion, the audit report certifications did fairly present the status and condition of the receipts and disbursements of the particular programs.

However, since, as already noted in this Memorandum, there is still some question whether mere negligent violation of accepted auditing standards is sufficient to constitute federal security law violation in an SEC statutory enforcement case, we have applied to AY the strict test of due diligence or negligence.

SPECIFIC FINDINGS SUMMARIZED— CHARGES AGAINST AY DEFEND- ANTS

The SEC, in substance and effect, charges that the AY defendants knew or should have known of certain of the Jack Burke defendants' above-mentioned improper practices, misstatements and/or omissions and, therefore, that the AY defendants violated the federal securities laws (either as primary defendants or as aiders and abettors of the Jack Burke defendants) by misstating in their audit report certifications that the JB and Geotek financial statements and AY's examination thereof were in accordance with generally accepted accounting principles and generally accepted auditing standards.[10] On all of these charges against the AY defendants we have found in their favor. (See, Specific Findings and Conclusions—I–VI, VIII and X).

A separate further SEC charge against AY is to the effect that, in preparing its

10. The generally accepted accounting principles and the generally accepted auditing standards (to which both SEC and AY experts on the subject have referenced their opinions) are those promulgated by the American Institute of Certified Public Accountants.

audit report certifications of the program receipts and disbursements financial statements, AY inadequately audited the books and records of Fundamental. On this charge against the AY defendants we have found in their favor. (See, Specific Findings and Conclusions—"X. Failure to Further Audit Fundamental").

## FINDINGS RE PROPRIETY OF INJUNCTIVE RELIEF

■ With respect to the appropriateness of injunctive relief in this action, the Court finds and concludes that, as to the Jack Burke defendants, the federal securities laws violations as herein found against said defendants are such that there is a reasonable likelihood and expectation that, unless now enjoined as provided in 15 USC §§ 78e and 77t(b), said defendants will commit further violations of the securities laws in the future.

As to AY, the Court finds and concludes that, even if a violation of the securities laws, as contended by the SEC herein, were found, the evidence is insufficient to show a reasonable likelihood or expectation that AY would commit further violations in the future.

## FINDINGS RE ENTRY OF JUDGMENT AS TO AY

Since multiple parties are involved in this action, the Court hereby determines that there is no just reason for delay and directs the entry of a final judgment in favor of the AY defendants pursuant to Rule 54(b), Fed.R.Civ.P.

This Memorandum of Decision, containing the General Findings and Conclusions of the Court, together with the Court's separately filed Specific Findings and Conclusions, which are hereby referred to and incorporated as a part hereof, constitute the findings and conclusions of the Court as required by Rule 52(a), Fed.R.Civ.P.

## COURT'S SPECIFIC FINDINGS AND CONCLUSIONS RE JACK BURKE DEFENDANTS AND ARTHUR YOUNG & COMPANY DEFENDANTS

## I. UNAUTHORIZED TRANSACTIONS

The SEC first contends that the Jack Burke defendants[1] engaged in certain practices and transactions in the JB and Geotek programs which were not authorized, or were expressly prohibited, by the JB and Geotek basic documents[2] and, therefore, that the basic documents and the audited financial statements for those programs contained material misstatements and/or omissions with respect to these "unauthorized" practices or transactions.

The SEC's contentions concerning these allegedly unauthorized transactions fall into four separate subcategories which will be discussed below: (A) Role of Fundamental; (B) Improper Disbursements; (C) Separate Bank Accounts; (D) Competitive Bidding.

### A. *Role of Fundamental*

The Fundamental Oil Corporation (hereinafter "Fundamental"), a corporation wholly owned and controlled by Jack Burke, engaged in a variety of activities on behalf of the JB and Geotek programs, as well as engaging in activities on its own behalf. The SEC's primary objection to the role of Fundamental, however, relates to the Geotek programs and is to the effect that,

1. For the purpose of these findings and conclusions, the "Jack Burke defendants" include Jack Burke and the JB Oil Co., in connection with the JB programs, and Jack Burke and Charter Street Corp., in connection with the Geotek programs. Three of the remaining four Jack Burke-controlled companies (i. e., The Fundamental Oil Corp., Geotek Resources Fund, Inc., (GRF) and GTR Management Co. ("GTR") have entered into consent judgments with the SEC, and the fourth (i. e., Citrix Oil Co.) was involved only with the Hydro and Petro programs, which programs are not covered herein. (See Memo of Decision, note 1).

2. The "basic documents" in the JB programs include: the offering circulars and program agreements (Exhibits 10A–10E; 11A–11E); the "basic documents" in the Geotek programs include: the prospectuses, limited partnership agreements and management agreements (Exhibits 12–17).

acting in contravention of the basic documents, both Geotek Resources Fund, Inc. (hereinafter, "GRF"), as general partner of the programs, and GTR Management Company (hereinafter, "GTR"), as manager of the programs, caused Fundamental to engage in a number of allegedly unauthorized Geotek program activities.

As to the JB programs, the SEC concedes that the JB Oil Company was expressly authorized in the JB programs' basic documents to deal with Fundamental, and contends only that the description of Fundamental set forth in a portion of one of the program's basic documents was misleading.

### 1. Geotek Programs

With respect to the Geotek programs, in contradistinction to the JB programs, Fundamental was not expressly named in the basic documents as a company which would perform program-related functions; the only specific reference to Fundamental in the Geotek basic documents was in a biographical section of the prospectuses, wherein it was disclosed that Jack Burke, Chairman and President of GRF and GTR, was also the President and sole stockholder of Fundamental and that certain other officers of GRF and GTR also were, or had been, officers of Fundamental. (Exhibits 12 and 13, pp. 15–16; Exhibits 14 and 15, p. 11; Exhibits 16 and 17, pp. 12–13).[3]

Although during the trial the SEC broadly contended that management of the Geotek programs had no authority at all to deal with Fundamental, that contention was supported only by equally broad testimony of one of the SEC's expert witnesses (Ten Eycke of the SEC staff). In its post-trial arguments, the SEC narrowed that contention to more specifically contend that the Jack Burke defendants misstated or failed to disclose that Fundamental was engaging in the following unauthorized Geotek program activities: (i) that Fundamental was

acting as an "operator" for the Geotek programs; (ii) that Fundamental was holding legal title to the Geotek program properties; (iii) that Fundamental was receiving and holding "advance" disbursements which had been advanced by the programs to GTR and in turn by GTR to Fundamental; (iv) that Fundamental was pledging program properties as collateral for bank loans.

As to AY, the SEC contends that AY knew or should have known of these allegedly unauthorized activities of Fundamental and of the Jack Burke defendants' failure to disclose them and that AY, therefore, improperly certified the audited Geotek financial statements.

#### (a) The Basic Documents

With respect to each of these challenged aspects of Fundamental's activities in the Geotek programs, the Geotek basic documents provided in pertinent part as follows:

#### (i) Fundamental as "Operator"

The Geotek *prospectuses* provided that it was contemplated that GTR, as manager of the Geotek programs, would enter into transactions on behalf of the programs with "various oil and gas operators, suppliers and contractors for the furnishing of equipment, supplies and services, including drilling services"; that neither GRF, as General Partner of the Geotek programs, nor GTR, nor any officer or director of either (all defined to be "affiliates") would have any interest directly or indirectly in any such operators, suppliers or contractors or derive any profit from such transactions; that, nevertheless, "affiliates" could acquire properties, participate in drilling operations and engage in other activities in the oil and gas business for their own account, but that "[n]o oil and gas lease or interest therein or other real or personal property of any kind [would] be acquired for the benefit of the

---

3. In the biographical section of the Geotek prospectuses it was disclosed that J. E. Matter, *Operations Manager* of GRF and GTR, was Vice-President of Fundamental (Exhibits 12 and 13, p. 16; Exhibits 14 and 15, p. 11); that Robert Mount, a Vice-President of GRF and GTR, had been Vice-President of Fundamental (Exhibit 16, p. 13); and that R. C. Marmaduke, Director and Vice-President of Exploration of GRF and GTR, was a consulting geologist (half-time) for Fundamental (Exhibit 17, p. 13).

Limited Partnerships from such affiliates . . . *except* for a price not greater than the actual cost of such property to the affiliated seller" (emphasis added); that properties could be acquired from an affiliate for a price greater than cost, but not greater than the then market value of the property, if, and only if, Geotek Resources Fund approved the acquisition by a vote of its directors and if the acquisition price was confirmed as not greater than the market value by a written evaluation report signed by an independent petroleum engineer. (E. g., Exhibits 12 and 13, pp. 17–18).

The Geotek *limited partnership agreements* provided, without limitation as to affiliates, that the General Partner (GRF) had complete authority in the management and control of the business of the programs and that the General Partner's powers included, but were not limited to, the power "to enter into operating agreements with others with respect to properties acquired by the Limited Partnership, naming a third party as operator . . . and containing such terms, provisions and conditions as the General Partner shall approve." (E. g., Exhibits 12 and 13, p. A–2, § 6.1).

It was under this authorization in the limited partnership agreements that the General Partner entered into a management agreement with GTR for each of the Geotek programs. The Geotek *management agreements* provided, without limitations as to affiliates, that the Manager (GTR) could "authorize an industry associate who owns a share of the working interest in a property or another qualified person to act as operator" and that, in the event this was done by the Manager, the Manager would act as agent for the programs in dealing with such "third party operator" and would "execute an operating agreement not inconsistent with the terms of the management agreement." (E. g., Exhibits 12 and 13, p. B–3, § 3.4).

The evidence is to the effect that no formal written operating (or "management service") agreement similar to that executed between the JB Oil Company and Fundamental was ever executed between GTR and Fundamental.

### (ii) *Fundamental as Holder of Legal Title to Program Properties*

The Geotek *management agreements* provided that "[u]nless otherwise directed by the Partnership, the Manager shall hold legal title to the Partnership's properties . . .". (E. g., Exhibits 12 and 13, p. B–3, § 3.5).

### (iii) *Fundamental as Recipient of Advance Disbursements*

Although the basic documents contain no express provisions concerning the Manager's authority to retransfer funds advanced to it to a third party, the *management agreements* did generally provide that the Manager had the authority, not only to manage the programs by itself, but also "to employ others from time to time in order to provide the experienced, qualified and competent personnel in the conduct of the Partnership's business." (E. g., Exhibits 12 and 13, p. B–1, § 1.1).

### (iv) *Fundamental as Pledger of Program Properties as Collateral for Bank Loans*

The Geotek *limited partnership agreements* provided that the General Partner (GRF) was authorized to "[b]orrow money from banks and other lending institutions for any Limited Partnership purpose and in connection therewith to hypothecate the assets of the Limited Partnership including, without limitation, the production and proceeds of production therefrom to secure repayment of the borrowed sums." (E. g., Ex. 13, p. A–3).

### (b) *The Evidence*

The evidence with respect to each of the above-mentioned four aspects of Fundamental's role in the Geotek programs is to the effect that: (i) Fundamental, although not actually acting as the "on-site operator" for program drilling rigs, was responsible for engaging and supervising third parties to operate such rigs and for providing sup-

plies and services for program drilling operations; (ii) that Fundamental did hold legal title to the program properties; (iii) that Fundamental did receive advance disbursements from GTR which had initially been advanced to GTR from the programs; and (iv) that Fundamental did pledge program properties as collateral for bank loans.

### (c) *Findings and Conclusions*

We find and conclude with respect to these four challenged aspects of Fundamental's role in the Geotek programs that the relevant provisions in the basic Geotek documents are so broad as to make it unclear whether or not any of the activities of Fundamental, which are challenged by the SEC, were actually unauthorized or otherwise improper. It is not clear, for example: (i) what is meant by the term "operator", as it was used in the three different Geotek basic documents, and whether the term "operator", at least as used in the limited partnership and management agreements, was required to be a *non*-affiliate; (ii) whether the general partner (or the manager) "otherwise directed" that Fundamental would hold legal title to the program properties, as authorized by the management agreements; (iii) whether any provision of the basic Geotek documents expressly or in substance prohibited GTR from transferring to Fundamental funds disbursed to GTR by the programs; (iv) whether, assuming Fundamental properly held legal title to the program properties, Fundamental was prohibited by the basic documents from pledging said properties upon instructions from the general partner to do so.[4]

■ We therefore conclude from the foregoing that the evidence is insufficient to support a finding that the representations in the basic documents concerning the role of Fundamental were fraudulent, intentional or, under the circumstances of this case, even negligent misstatements, as to which some further disclosure was required.

We further find and conclude, however, that, even if the role of Fundamental was improperly represented or inadequately disclosed, the question remains whether, under the circumstances of this case, any of the misrepresentations or omissions were *material*. In other words, we must still determine whether, even if the challenged activities of Fundamental were *not* authorized by the basic documents, such unauthorized activities constituted *material* deviations from the terms of the basic documents.

In connection with this issue of *materiality,* the evidence is to the effect that Fundamental, GRF and GTR were widely known to be, in effect, one and the same and, therefore, that nothing done by Fundamental on behalf of the programs in fact increased the degree of risk to the Geotek investors. For over four years prior to the Geotek programs, Fundamental had been the expressly named and widely known "operator" for all the JB programs. With the exception of the Geotek 69–1 prospectus, the Geotek prospectuses disclosed that Jack Burke had been "an officer and a shareholder of companies which have acted as operator for and supplied services and property to the JB programs and others" (E. g., Ex. 14, p. 17). As above indicated, the Geotek prospectuses also disclosed the existence of Fundamental, the fact that Jack Burke was the President and sole shareholder of Fundamental, and the fact that several officers and officials of GTR and Geotek resources Fund were also officers or officials of Fundamental.

The Geotek prospectuses also emphasized the importance of Jack Burke's personal role in the management of the Geotek programs, and disclosed that Jack Burke was the organizer, founder and owner of more than 80% of the outstanding stock of GTR (Manager of the Geotek programs); that GTR, in turn, owned all of the outstanding stock of GRF (General Partner of the Geotek programs) and Charter Street (underwriter of the Geotek programs); and that

---

4. For further discussion of the propriety of the bank loans obtained by Fundamental see *infra* "VI. BANK LOANS", p. 59).

GTR could be deemed the "promoter" or "parent" of the corporations involved in the Geotek offerings. (E. g., Exhibit 12, p. 3).

We further note that the evidence shows that Fundamental was merely a "wash" corporation which made no profits; that Fundamental had no employees of its own, but "shared" the services of a single group of employees with GTR, which latter company actually paid the employees; and further, that it was generally known at all times since 1964 that Jack Burke, JB Oil Co., GTR and Fundamental all occupied the same offices and utilized the same record keeping facilities.

Finally, the evidence shows that, as early as 1970, the SEC, itself, had information before it, indicating the nature of Fundamental's role in the Geotek programs, and that the SEC took no action nor made any comment concerning any impropriety or invalidity of Fundamental's role under the basic Geotek documents. We find, for example, that, in January, 1970, as a result of an SEC investigation into the various Jack Burke entities, Jack Burke, himself, informed the SEC of the nature of Fundamental's role in the operations of the Geotek programs; that Fundamental was described as an "operator" for the Geotek programs in an October, 1970 press release; that a bulletin sent to investors in October, 1970, indicated Fundamental was conducting merger negotiations on behalf of Geotek; that a Memo of Agreement sent to the SEC in early 1971 stated that Fundamental was an "operator" for the Geotek programs; and that AY's own financial report of April, 1971, disclosed that Fundamental was a company owned by Jack Burke and that Fundamental had borrowed $2.5 million from a bank for the purpose of continuing development of oil and gas properties under management by GTR, including properties managed on behalf of the Geotek 69–1 program.

From this evidence, we find and conclude that the authorization of power to the Jack Burke-controlled Geotek management companies was so broad and so clearly disclosed that failure to further disclose the role of Fundamental (merely another Jack Burke-controlled company) did not constitute a material deviation from the terms of the basic documents.

The SEC finally contends, however, that even though both GTR and Fundamental were controlled by Jack Burke (i. e., as the chief executive officer of both companies), GTR and Fundamental were different in the following material respects: (a) GTR had "outside" directors, whereas Fundamental did not; (b) GTR was, in at least small part, owned by outsiders, whereas Fundamental was wholly owned by Jack Burke; (c) GTR managed only the assets of Geotek programs, whereas Fundamental managed assets of non-Geotek programs and entities (e. g., P–2000, Petroforce and Washington Oil); (d) GTR managed the Geotek programs pursuant to a written management agreement with GRF, whereas Fundamental had no written agreement with either GTR of GRF.

The evidence is to the effect, however, that Jack Burke, as president of both GRF and GTR, had access to the funds of the Geotek programs without operating through Fundamental. Further, there is no evidence with respect to the Geotek programs that Burke's dominant position in the Geotek programs was not subject to such controls as were exercised or exercisable by the eventually appointed independent directors of GRF and GTR, and there is no evidence that these companies did not actually perform their respective functions with respect to Geotek dealings with Fundamental.

As to these allegations insofar as they are brought against the Jack Burke defendants, we find and conclude that the evidence is insufficient to show said defendants fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions.

As to AY, we find and conclude that the evidence is insufficient to show that AY fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omis-

sions in certifying the financial statements in question.

### 2. *JB Programs*

As to the JB programs, with the exception of the JB–68 program,[5] the program-related activities which Fundamental was authorized to perform were fully described in both the offering circulars and the program agreements.

The JB–64 through JB–67 program *offering circulars* provided that, after production had been obtained in a test well block, the JB Oil Company and the program participants would execute a "joint operating agreement"; that the operator would ordinarily be Fundamental, which was described as "a management company which has provided administrative and oil field operating services to Company and affiliated companies for several years." (Exhibits 10A, 10B and 10C, p. 4, ¶ 4; Exhibit 10D, p. 5, ¶ 4). In the JB–65, JB–66 and JB–67 offering circulars, it was further disclosed that the management of the JB Oil Company was "identical" or "substantially identical" to the management of Fundamental and that the services of Fundamental would be furnished at cost (Exhibits 10B and 10C, p. 4, ¶ 4; Exhibit 10D, p. 5, ¶ 4). In the JB–65 and JB–66 offering circulars it was disclosed that Jack Burke was the Chief Executive Officer of both the JB Oil Company and Fundamental (Exhibit 10B, p. 6; Exhibit 10C, p. 8).

The JB–64 through JB–66 *program agreements* provided that Fundamental would furnish the JB Oil Company with management and administrative services at cost and that, although the JB Oil Company would be designated as "Operator" for each producing well, the JB Oil Company was authorized to delegate contractually some or all of the duties of operator to Fundamental, or to some other company (Exhibits 11A, 11B and 11C, § 7.1).

It was pursuant to this authorization in the JB program agreements that the JB Oil Company, on behalf of JB–64, and Fundamental as "operator", entered into an operating or "management service" agreement, dated June 30, 1964 (Exhibit 696), which agreement was thereafter made applicable to all other JB programs. (Exhibits 696(a)–700).

In the JB–67 program agreement, however, the above-mentioned authorization clause was slightly modified to provide that the JB Oil Company could delegate the duties of operator to "an *independent contractor*, such as the Fundamental Oil Corporation" (emphasis added). (Exhibit 10D, § 7.7).

■ The SEC contends that this phrase, describing Fundamental as an "independent" contractor constitutes a material misstatement by the Jack Burke defendants and further, that the Jack Burke defendants should have affirmatively corrected the misstatement in the subsequently issued financial statements for the JB–67 program.

As to AY, the SEC contends that it knew or should have known that this description of Fundamental was false and misleading and that the Jack Burke defendants had failed to disclose Fundamental's affiliated status and that AY, therefore, should not have certified the JB–67 financial statement.

Both the Jack Burke defendants and AY contend that the description of Fundamental as an independent contractor was not intended to mislead investors with respect to Jack Burke's ownership and control of the corporation but was intended merely to describe the type of contractual relationships into which the JB Oil Company was authorized to enter.

As to this SEC allegation insofar as it is brought against the Jack Burke defendants, we find and conclude that, even if the de-

---

**5.** With respect to the JB–68 program, Fundamental was not specifically mentioned in either the offering circular or the program agreement, although the latter agreement did provide that the JB Oil Company was authorized to contract with some other company for the performance of some or all of the duties of operation (¶ 7.7). The SEC, however, makes no claims concerning Fundamental's activities in connection with this program.

scription of Fundamental as an independent contractor could technically be considered to be a misstatement, the evidence is insufficient to show that the description, when read in the context of the remainder of the JB–67 program agreement and in the context of the JB–67 offering circular, constitutes a fraudulent, intentional, or, under the circumstances of this case, even a negligent material misstatement or omission.

As to AY, we find and conclude that the evidence is insufficient to show that AY fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in certifying the JB–67 program financial statement.

## B. *Improper Disbursements*

The second category of allegedly unauthorized transactions challenged by the SEC involves certain disbursements of funds in the JB and Geotek programs.

The evidence shows that capital for each of the JB and Geotek programs was acquired by seeking and obtaining cash investments or "subscriptions" from individual investors. Each program was held open to receive such subscriptions for a limited period of time and each program had a dollar maximum for the total of aggregate subscription funds which it would receive.

The evidence further shows that, for the purposes of the day-to-day operation of the programs, the subscription funds were periodically disbursed by the programs to their operator and/or manager.

The SEC contends that the Jack Burke defendants failed to disclose that certain aspects of the disbursement of such funds were not authorized by the basic documents.

The JB–64 through JB–66 *program agreements* provided that "[s]uch moneys shall be disbursed to Company from time to time upon presentation of, and only for the purpose of paying invoices, bills and statements for expenses (or obligations) incurred in the program." (Exhibits 11–A, 11–B and 11–C, §§ 4.6 and 4.7).

The JB–67 and JB–68 *program agreements* were changed somewhat: the JB–67 program agreement provided that the subscription fund "shall be disbursed by [JB Oil] Company from time to time upon presentation of invoices, bills or statements for obligations incurred or to be incurred" (Exhibit 11–D; § 4.6); the JB–68 program agreement provided that the subscription fund "shall be disbursed by [JB Oil] Company from time to time upon presentation by the payee of invoices, bills, statements or a guarantee concerning agreements made or to be made." (Exhibit 11–E; § 4.4).

As to the Geotek programs, the *prospectuses* provided that "after a minimum of $200,000 in subscriptions for investment in a particular Limited Partnership has been received, such monies may be used by the [general partner] for the purchase of properties and other interests for, and the payment of expenses incurred on behalf of, the Limited Partnership being formed" (Exhibits 12–15, p. 7; Exhibits 16 and 17, p. 8); that "any Limited Partnership's capital may be used for the acquisition of interests in properties or projects owned by any of the other Limited Partnerships" (Exhibits 12–15, p. 8; Exhibits 17 and 18, pp. 9–10); that, "[i]f not immediately needed for Limited Partnership purposes, [Limited Partnership] funds may be temporarily invested in certificates of deposit or other interest bearing securities, with the interest thereon being credited to such Limited Partnership" (Ibid.); and further, that "[s]uch funds may also be temporarily used for the purchase of properties for investor, and transfer . . . to Limited Partnerships formed at a later date" (Exhibits 12–15, pp. 7 and 9; Exhibits 16 and 17, pp. 8 and 10–11). The Geotek prospectuses also provided that, unless otherwise delegated, the GTR Management Company would "manage the capital and operations of each Limited Partnership" and would do so under the terms of a "Management Agreement" (Exhibits 12–15, pp. 10 and 20; Exhibits 16 and 17, pp. 11 and 27).

The Geotek *limited partnership agreements* provided that the General Partner

"shall have full, exclusive and complete authority in the management and control of the business of the Limited Partnership;" that "the powers of the General Partner include, but are not limited to, the power to . . . [i]f not immediately needed for Limited Partnership purposes, temporarily invest Limited Partnership funds in certificates of deposit," etc., as above set forth in the Geotek prospectuses (Exhibits 12–17, § 6.1(m) pp. A–2 and A–4).

The Geotek *management agreements* provided that "[t]he Partnership hereby employs the Manager to act for it" in the business of the Partnership; that "[t]he Partnership shall transmit the Partnership capital to the Manager in such amounts and at such times as the Manager shall request;" and that "[i]f not immediately needed for Partnership purposes, the Manager may temporarily invest Partnership funds in certificates of deposit," etc., as above-set forth in the prospectuses. (Exhibits 12–17; §§ 1.1, 2.1 and 3.6, pp. B–1, B–2 and B–3).

### 1. *Advance Disbursements*

■ The SEC first contends that, contrary to the express terms of the JB and Geotek basic documents, the programs made certain "advance" disbursements to the operator and/or manager (i. e., disbursements in excess of the actual expenditures which had at that time been incurred by the operator and/or manager), and that the Jack Burke defendants omitted to state in the basic program documents or the program financial statements that such "advance" disbursements would be, were being or had been made.

The SEC also contends that AY either knew or should have known of these "advance" disbursements and of the Jack Burke defendants' failure adequately to disclose them and, therefore, that AY improperly certified the JB and Geotek financial statements.

As to this allegation, we first find and conclude that the JB–67, JB–68 and the Geotek basic documents did authorize advance disbursements and, therefore, that the basic documents for those programs contained no material misstatements or omissions. As hereinabove set forth, the JB–67 and JB–68 program agreements expressly authorized disbursements for obligations "made or *to be made*" and "incurred or *to be incurred*", and the Geotek management agreements expressly authorized disbursements to the manager *"as the Manager may request"*, without limitation as to the purposes for which such funds may be requested.

With respect to the earlier JB–64, JB–65 and JB–66 programs, however, we find and conclude that advance disbursements were *not* expressly authorized by the basic documents. The JB–64, JB–65 and JB–66 program agreements provided that program funds "shall be disbursed . . . *only* for the purpose of paying invoices, bills and statements for expenses (or obligations) *incurred* in the program."

However, as to all the JB and Geotek programs (including JB–64, JB–65 and JB–66), we further find and conclude that, even if the "advance disbursements" were not expressly authorized by the basic documents, the fact that they had been made was adequately disclosed in the JB and Geotek program financial statements.

In each of the JB–64, JB–65 and JB–66 programs' financial statements there appeared a line-item entry labeled "Advance to operator", which was accompanied by a footnote which stated as follows: "At [date of the close of the statement period] the program had transferred funds to Fundamental in excess of the billings rendered by Fundamental to that date . . . [t]his amount, [dollar amount] is shown in the accompanying financial statement as an advance to the operator." (Exhibits 18a, 18b and 18, note 2).[6] The identical line-item

---

**6.** In the second financial statement issued for JB–64, dated October 21, 1968, the reporting format was changed somewhat and rather than the "advance to operator" line-item entry used

previously, there appears an entry "Net change in account with operator" together with the two sub-entries: "Due from operator, December 31, 1964" and "Due from operator, Decem-

entry also appeared in the JB–67 and JB–68 financial statements, and it was also accompanied by a footnote which stated as follows: "From inception of the Program . . . to [the date of the close of the statement period] the funds transferred from the Program to Fundamental exceeded by [dollar amount specified in each statement] Fundamental's disbursements chargeable to the Program." (Exhibits 19 and 20, note 2).

As to the Geotek programs, there appeared in the Geotek 69–1 financial statements two line-item entries labeled: "Excess (deficiency) of receipts over disbursements" and "Balance at end of period represented by receivable from (payable to)· GTR Management Company, Inc."; in the Geotek 70–1 and 70–2 financial statements there appeared a single line-item entry labeled "Excess of receipts over disbursements at December 31, 1970 represented by receivable from GTR Management Company, Inc." (Exhibits 22 and 23).

As to the Jack Burke defendants, therefore, we find and conclude that the evidence is insufficient to show that they fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misrepresentations or omissions with respect to "advance" disbursements.

As to AY, we find and conclude that the evidence is insufficient to show that AY fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in certifying the financial statements in question.

### 2. Presentation of Bills and Invoices

▆▆ The SEC contends that, contrary to the above-quoted terms of the JB program agreements, JB program funds were disbursed to the operator without proper "presentation of bills and invoices" by the operator. The SEC contends that the Jack

Burke defendants misstated in the JB basic documents that such bills and invoices would be presented and also that those defendants failed to disclose in the financial statements that such bills and invoices had *not* been presented.

As to AY, the SEC contends that AY knew or should have known that proper bills and invoices had not been presented and that the Jack Burke defendants had failed to disclose this fact and, therefore, that AY improperly certified the JB financial statements.

As to this allegation we find and conclude that, pursuant to the JB program agreements, in order for the operator (Fundamental) to obtain a disbursement of program funds, it was merely required to present to the programs the bills and invoices which had been submitted to it, as operator, by various third-party contractors. The program agreements did *not* require, as apparently contended by the SEC, that the operator prepare and present its own separate bills and invoices, duplicating the charges shown in the third-party contractors' bills and invoices. ·

The evidence is to the effect that, with the exception of so-called "advance disbursements" (which, by definition, were made prior to the presentation of bills and invoices), all ordinary disbursements were in fact made upon presentation of bills and invoices from third-party contractors.

Accordingly, as to this allegation insofar as it is brought against the Jack Burke defendants, we find and conclude that there is insufficient evidence to show that said defendants fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions.

As to AY, we find and conclude that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, even negligently

---

ber 31, 1967." Footnote No. 2 to that financial statement further states that "from the inception of the Program on February 28, 1964 to December 31, 1967 the funds transferred from

the Program to Fundamental exceeded by $15,755 Fundamental's disbursements chargeable to the Program."

made any material misstatements or omissions in certifying the JB program financial statements.

### C. *Separate Bank Accounts*

■ The third category of unauthorized transactions challenged by the SEC involves the maintenance of separate bank accounts for the individual JB and Geotek programs.

The JB–64, JB–65 and JB–66 *program agreements* provided that monies received from investors into the program fund "shall not be deposited to the account of [JB Oil] Company, but shall be held in a segregated escrow or trust account" (Exhibits 11–A, 11–B and 11–C, § 4.7); the JB–67 *program agreement* provided that the subscription funds "shall be credited to a trust account" (Exhibit 11–D, § 4.6); and the JB–68 *program agreement* provided that the subscription funds "shall be credited to a separate account" (Exhibit 11–E, § 4.4).

As to the Geotek programs, the *prospectuses* provided that "[a]ll monies contributed by subscribers will be deposited in a separate subscription account with United California Bank, San Francisco, California, as custodian, and will be so maintained until transferred to the account of the Limited Partnership in which they are invested" (Exhibits 12–15, p. 7; Exhibits 16–17, p. 8); and that "[t]he funds of each Limited Partnership will be maintained in a separate bank account" (Exhibits 12–15, p. 8; Exhibits 16–17, p. 10).

The Geotek *management agreements* provided that "[t]he Manager shall credit the Partnership account with all Partnership capital received by the Manager and the Partnership's share of cash contributions and all other income received by the Manager on behalf of the Partnership"; that "[t]he Manager shall charge the partnership's account with its proportionate share of . . . expenses . . . incurred in managing the Partnership's capital"; and that "[t]he Manager shall maintain appropriate books of account relating to all financial relationships with the Partnership" (Exhibits 12–17; §§ 2.2, 2.3 and 3.7; pp. B–2 and B–3).

The SEC contends that, in contravention of the express terms of the basic documents, JB and Geotek program funds were not maintained in separate bank accounts *after* they were disbursed from the program to the operator and/or manager and that the Jack Burke defendants were obligated to disclose that fact.

As to AY, SEC contends that AY knew or should have known that separate bank accounts were not being maintained in accordance with the terms of the JB and Geotek basic documents and that the Jack Burke defendants had failed to disclose that fact and, therefore, that AY improperly certified the JB and Geotek financial statements.

The evidence is to the effect that, upon receipt, subscription funds *were* maintained in separate bank accounts but that, upon disbursement to the programs' operator and/or manager, the funds were separately accounted for in the operator's and/or manager's single bank account. (Testimony of J. Aldrich).

As we construe the relevant provisions of the basic documents, although they clearly provided for separate bank accounts for subscription funds when such funds were initially deposited with programs, the basic documents did *not* expressly provide or reasonably imply that such separate bank accounts would be maintained *after* such funds had been disbursed by the programs to the operator and/or manager.

The JB basic documents, for example, did not specifically provide for the maintenance of separate "bank accounts", but rather provided for the maintenance of separate "trust accounts", "escrow accounts" or simply "accounts", which terminology is more consistent with the maintenance of separate *bookkeeping* accounts (as opposed to separate *bank* accounts) during the continuing operation of the programs.

With respect to the Geotek basic documents, although the Geotek prospectuses did contain an express provision for the maintenance of separate bank accounts, the provisions in the management agreements

to the effect that such funds would be transmitted to the manager "as the manager shall request" and that the manager would then *"credit"* and *"charge"* the programs with receipts and expenses (rather than "deposit" or "withdraw" funds) indicate that the manager was only required to maintain separate *bookkeeping* accounts for each program. Generally accepted principles of business efficiency, and the specific provisions of the Geotek prospectuses that the capital of one program could be used for the acquisition of interests in properties owned by other programs (supra, pp. 727–728), are also more consistent with an interpretation of the Geotek basic documents as only requiring the manager to maintain separate bookkeeping accounts.

Further, the deposition testimony of the SEC's own accountant (Wideman) is to the effect that, at least with respect to the JB programs, the financial statements clearly and adequately disclosed the fact that the operator was not maintaining separate *bank* accounts.

As to these allegations insofar as they are brought against the Jack Burke defendants, we find and conclude that there is insufficient evidence to show that said defendants fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions with respect to the maintenance of separate bank accounts.

As to AY, we find and conclude that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in certifying the financial statements in question.

As to AY, we further find that AY requested and received an opinion letter from management's legal counsel which represented that it was entirely proper under the basic documents for JB funds to be periodically transferred from the program accounts to the operator for disbursement on behalf of the programs with appropriate "credits" and "debits" to the program accounts. We also note that not one of the

four expert accounting witnesses (including two SEC experts) testified that AY had any professional responsibility to require the disclosure of any facts concerning the existence or non-existence of separate bank accounts.

### D. *Competitive Bidding*

The fourth category of unauthorized transactions challenged by the SEC involves the alleged absence of competitive bidding for drilling contracts in the JB programs.

The JB *program agreements* contained specific provisions relating to the letting of contracts for the drilling of "test wells". The JB–64 and JB–65 program agreements provided that "[a]ll test wells drilled or caused to be drilled by [the JB Oil] Company hereunder shall be drilled by independent drilling contractors chosen by competitive bidding." (Exhibits 11–A and 11–B, § 3.4). The JB–66, JB–67 and JB–68 program agreements provided that "[t]he JB Oil] Company shall endeavor to arrange that wells drilled by Company hereunder shall be drilled for an amount ·and under terms not less favorable than those of the lowest responsible available competitive driller." (Exhibit 11–C, § 3.4; Exhibit 11–D, § 3.3; Exhibit 11–E, § 3.2). Each of the above program agreement provisions relating to test wells further provided that "[t]he JB Oil] Company shall use its best efforts to arrange turnkey drilling contracts, and shall further use its best efforts to conduct all test well drilling within the year [of each program]".

As to the Jack Burke defendants, the SEC contends that certain test wells drilled for the JB–64, JB–65 programs were not drilled by contractors chosen by competitive bidding; that certain test wells drilled for the JB–67 and JB–68 programs were not drilled for amounts and under terms equal to or more favorable than those of the lowest available competitive driller; and that the Jack Burke defendants made made material misrepresentations and/or omissions with respect to each of those facts.

As to AY, the SEC contends only that AY knew or should have known of the Jack

Burke defendants' misrepresentations and/or omissions concerning the JB–64 and JB–65 programs and, therefore, that AY improperly certified the financial statements for those programs. The SEC makes no contention against AY with respect to competitive bidding in the JB–66, JB–67 and JB–68 programs.

### 1. *The JB–64 and JB–65 Programs*

With respect to the JB–64 and JB–65 programs, the evidence is to the effect that there are several types of drilling contracts or agreements in the oil and gas industry; that at least one such type of agreement (i. e., "turnkey" agreements) are *not* susceptible to competitive bidding; that, with the exception of a drilling contract for the so-called "Montezuma" prospect, all of the JB–64 drilling contracts were turnkey-type agreements for which there could have been and was no competitive bidding; that the JB–65 drilling contracts were both turnkey and non-turnkey-type agreements; and that there *was* competitive bidding for all of the non-turnkey-type JB–65 drilling contracts.

Based upon the foregoing evidence, we conclude that, inasmuch as the JB–64 and JB–65 program agreements expressly required the JB programs' management, not only to obtain drilling contracts on the basis of competitive bidding, but also to obtain turnkey-type contracts, the JB program agreements should be reasonably construed as requiring competitive bidding *only* for non-turnkey drilling contracts.

With respect to the JB–64 "Montezuma" prospect drilling contract, we find and conclude that there is no evidence the Jack Burke defendants knew or should have known at the time they prepared the JB–64 basic documents that there would subsequently be no competitive bidding for the "Montezuma" contract, and we further find and conclude that the lack of competitive bidding for that single drilling contract was not a *material* fact which was required to have been disclosed in the JB–64 financial statements.

Accordingly, as to these allegations with respect to the JB–64 and JB–65 programs insofar as they are brought against the Jack Burke defendants, we find and conclude that there is insufficient evidence to show that those defendants fraudulently, intentionally or, under the circumstances of this case, negligently made any material misstatements or omissions concerning competitive bidding.

As to AY, we find and conclude that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in certifying the JB–64 and JB–65 program financial statements.

As to AY, we further find that the evidence is at best evenly balanced as to whether, according to professional standards of accounting, AY was even obligated to examine the details of the bidding for program drilling and acquisition contracts in certifying the programs' receipts and disbursements. The evidence is to the effect that the absence of formal competitive bidding in the oil exploration industry is not so unusual that it would suggest to AY the existence of improper contract dealings; that responsible competitive bidders are frequently not readily available to programs which are as small as JB–64 was in 1964, or to programs which drill as late in the calendar year as did the JB–64 program in 1964.

### 2. *The JB–66, JB–67 and JB–68 Programs*

With respect to the JB–66, JB–67 and JB–68 programs, the evidence is to the effect that certain drilling contracts entered into between those three programs and the so-called Robert Burke secret companies (i. e., Island Oil Corp., Regent Oil Corp., Northern Continental Petroleum Corp., and Ramada Drilling Co.), were entered into for amounts or under terms which were *not* "equal to or more favorable than those of the lowest responsible available competitive driller" and, in fact, were entered into for amounts and under terms

which resulted in a concealed personal gain to Jack Burke of at least $250,000.

Accordingly, as to the Jack Burke defendants we find and conclude that the JB–66, JB–67 and JB–68 basic documents and financial statements *did* contain material misstatements and/or omissions within the meaning of the federal securities laws and that said misstatements and/or omissions were made by those defendants with knowledge of their falsity and with intent to deceive.

As to AY, as above indicated, there is no SEC contention raised against AY with respect to the competitive bidding requirement for these three JB programs.

## II. AFFILIATED PROPERTY TRANSFERS AND DRILLING CONTRACTS

In both the JB and the Geotek programs, properties were acquired from, and drilling contracts were entered into with, Jack Burke personally and Jack Burke-affiliated companies (i. e., companies in which Jack Burke had an ownership interest). The SEC challenges the adequacy of the disclosures made in connection with several of these transactions.

### A. *Property Transfers From the So-Called "Robert Burke Companies" to the JB Programs*

■ The SEC contends that Jack Burke caused the JB programs to enter into certain property acquisition contracts with the four so-called "secret" companies (i. e., Island Oil Corp., Northern Continental Oil Corp., Ramada Drilling Company and Regent Oil Company), which companies were owned and controlled by Jack Burke and his brother Robert Burke, and that the Jack Burke defendants failed to disclose either the affiliated status of those secret companies or the fact that the contracts were entered into at a profit to the secret companies and thereby to Jack Burke, himself.

As to the Jack Burke defendants, we find and conclude that, regardless of the immediate or ultimate benefit conferred upon the programs through these transactions, the fact that the transactions were with "affiliates" and the fact that the transactions resulted in a profit to Jack Burke, personally, were material facts which the Jack Burke defendants, not merely negligently, but knowingly and with intent to deceive, failed to disclose. Accordingly, we conclude that the failure of the Jack Burke defendants to disclose these facts constitutes a violation of the federal securities laws.

As to AY, although the SEC originally contended in its pretrial statement that AY's failure to discover, and thereafter to require disclosure of, the affiliated status of these companies constituted a violation of AY's duties as a professional accountant, the SEC abandoned this contention at trial and introduced no evidence to support it.

### B. *Drilling Contract Between JB–68 and the Mutual Drilling Company*

■ In 1968, the JB–68 program paid $705,000 to the Mutual Drilling Company (hereinafter, Mutual), a company wholly owned and controlled by Jack Burke, for drilling to be done during that year on certain JB–68 properties.

The SEC contends that the Jack Burke defendants violated the federal securities laws by failing to disclose that Mutual was an "affiliated" company and also by misrepresenting to investors that the $705,000 paid to Mutual could be taken as a valid tax deduction in 1968. The SEC contends that the Jack Burke defendants knew, but failed to disclose, that Jack Burke had personally misused and misappropriated approximately $600,000 of the $705,000 paid to Mutual and, in order to conceal this misappropriation of funds, that Burke, in 1970, signed a backdated contract between JB–68 and Mutual which purported to substitute new properties for those which had originally been designated for drilling by Mutual.

The evidence with respect to the Mutual transaction is in substance to the effect that the $705,000 paid by Fundamental to Mutual Drilling Co. for drilling on behalf of JB–68 was ultimately and actually expended for drilling and development on properties of JB–68 (See Ex. 31), but that approxi-

mately $400,000 of the $705,000 was temporarily diverted by Jack Burke through his personal bank account for a period of time from February, 1969 to May, 1969; that, as found by Coopers & Lybrand—an independent auditing firm engaged to review the JB and Geotek programs' financial position in connection with the instant receivership—this transaction did not involve any permanent misappropriation of funds nor did it involve any ultimate loss to the JB–68 program.

As to this SEC allegation against the Jack Burke defendants, however, we find and conclude that, regardless of the validity of any tax deductions taken with respect to the Mutual transaction or the possible misappropriation of funds by Jack Burke, the fact that Mutual was a Jack Burke-affiliated company constituted a material fact which the Jack Burke defendants were obligated to disclose and which they knowingly, and with intent to deceive, failed to disclose. Accordingly, we conclude that failure of those defendants to make such a disclosure constitutes a violation of the securities laws.

■ As to AY, the SEC does not contend that, at the time the JB–68 financial statement was certified in September of 1970, AY knew of Mutual's affiliated status or Burke's alleged misappropriation of funds. It contends only that AY's certification examination of the JB–68 financial statement was inadequate insofar as it included an examination of the Mutual transaction and, therefore, that AY improperly certified the JB–68 financial statement. Specifically, the SEC contends that AY, in its examination, should have somehow discovered certain "inconsistencies" in connection with the Mutual transaction which, in turn, should have led AY to conduct an even more thorough examination of the transaction.

These so-called "inconsistencies" are alleged to be as follows: (a) The JB–68 program management represented to AY in 1969 that the Mutual transaction involved *four* specifically designated prospects, whereas the contract between Mutual and

Fundamental, which was dated "as of December 28, 1968", and which was first shown to AY in October, 1970, listed *seven* specific prospects—only two of which were among the original four; (b) one of those seven prospects ("South Lake Charles") was listed in the Mutual contract as owned by JB–68, whereas that prospect had been listed in AY's June, 1969 personal audit of Jack Burke, as owned by him personally; (c) the Mutual contract which was shown to AY in October, 1970, provided that Mutual would transfer title to the properties to Fundamental, whereas AY knew or should have known that, as of the contract date, Fundamental already had title to certain of the properties; (d) the contract provided that all drilling would be commenced by December 31, 1968, whereas AY knew or should have known that no drilling was actually begun until 1969; (e) the contract provided that Mutual would be the operator of the "Phelps" prospect, whereas AY knew or should have known that Fundamental was the operator for that prospect; (f) the contract provided that $100,000 would be expended on each of the seven prospects, whereas AY knew or should have known that the actual expenditures for each prospect had been either more or less than that amount.

The SEC also contends as to AY, that in February, 1971, after AY had received a copy of an affidavit submitted by Jack Burke to the SEC which disclosed the affiliated status of Mutual, AY should have issued a retroactive change in its September, 1970 certification of the JB–68 financial statement. The SEC contends that this affidavit considered alone, but especially considered in light of the above-mentioned "inconsistencies", either did or should have put AY on notice that Mutual was an affiliated company.

As to these allegations against AY, we first find and conclude that AY in fact had no knowledge on September 8, 1970, when it issued its audit report certification of the JB–68 financial statement, that Mutual was an "affiliated" company.

With respect to the above-listed "inconsistencies", the evidence shows that neither of the SEC's two experts opined that the inconsistencies should have led AY to discover Mutual's status as an affiliate; that AY examined the Mutual contract and found that it appeared to be in proper order; that the contract contained the proper dollar amounts and supported the drilling costs charged to JB–68 in the financial statement; that, in reviewing the contract and its prior records, AY did note the discrepancy as to the prospects to be drilled under the contract, but AY justifiably relied upon the representation of JB–68's management that the discrepancy was merely the result of clerical error. Accordingly, we find and conclude that AY's failure to discover from the so-called "inconsistencies" that Mutual was an affiliated company was not the result of any breach by AY of its professional duties as an accountant.

With respect to AY's receipt of the Jack Burke affidavit in February, 1971, the evidence shows that a copy of the affidavit came routinely into the hands of Thomas W. Orr, an AY accountant in February, 1971—more than four months after the JB–68 audit had been completed and while AY was then working on its Geotek 69–1 audit; that this copy of the affidavit was received by AY from a New York attorney employed by the Geotek programs' management and was attached to a copy of a letter from that attorney to the SEC relating to a Geotek program registration statement; that the affidavit included, among other things, a list of numerous companies in which Jack Burke had an ownership interest, which list included Mutual; that, apparently, upon receipt of the materials containing the copy of the affidavit, the AY accountant (Orr) merely filed the correspondence with the Geotek 69–1 work papers. The evidence further shows that expert witness Flynn testified that, considering the form and manner in which, and the circumstances whereunder, the copy of the Burke affidavit came into AY's hands in February, 1971, the receipt of the copy of the affidavit would not have reasonably alerted an accountant under similar circumstances to the significance of the listing of Mutual Drilling Company.

We find and conclude, therefore, that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, negligently made any material misstatements or omissions in certifying the JB–68 financial statement. Nor is there sufficient evidence to show that AY's failure after February, 1971, to note Mutual's affiliated status and issue a retroactive change in the JB–68 audit report constituted a breach in AY's professional duty as an accountant.

### C. *Property Transfers from Jack Burke and/or Fundamental to Geotek 69–1*

In 1969, the Geotek 69–1 program acquired a substantial number of properties from Jack Burke personally and/or from Fundamental.

The Geotek 69–1 *prospectus* expressly authorized such acquisitions from "affiliates", with certain limitations and restrictions. "Affiliates" were defined in the prospectus as including GRF, GTR, and any officer or director of either of them, and, with respect to the acquisition of properties from such affiliates, the prospectus provided as follows:

"No oil and gas lease or interest therein or other real or personal property of any kind will be acquired for the benefit of the Limited Partnerships from such affiliates or any of them except for a price not greater than the actual cost of such property to the affiliated seller . . . provided, however, that properties may be acquired for the benefit of the Limited Partnerships from an Affiliate for a price greater than such cost, or if the affiliate has reason to believe that the property has declined in value, for a lower price, but in no event greater than the then market value of such property if and only if the [general partner] approves the acquisition by a vote of its directors, with all directors who may profit from such acquisition making a full disclosure

of the relevant facts . . . and if the acquisition price is confirmed as not greater than the market value by a written evaluation report signed by an independent . . . petroleum engineer . . .". (Exhibit 13, p. 18).

Although the SEC does not challenge the authority for the property transfers from Jack Burke and/or Fundamental, to the Geotek 69-1 program, it does challenge the adequacy of the disclosures which were made by the Jack Burke defendants in connection with the transfers.

■ The SEC first contends that the Jack Burke defendants failed to disclose that substantially all of the properties transferred to Geotek 69-1 were transferred from Jack Burke personally and that drilling had been done on several of the properties after the properties had been acquired by Jack Burke or Fundamental and prior to the effective date of the Geotek 69-1 prospectus.

As to these allegations, we find and conclude that the Geotek 69-1 financial statement did adequately disclose both the affiliated nature of the property transfers and the fact that previous drilling had been done on several of the properties.

The Geotek 69-1 financial statement contained the following disclosure:

"The Partnership acquired substantially all of its oil and gas properties from the Management Company, or its affiliates, on the basis of actual costs incurred by the beneficial owner of the property immediately prior to this acquisition. Properties transferred included undeveloped and developed leases, including properties on which wells (producing and dry) had previously been drilled." (Exhibit 22, p. f-4, note 2).

With respect to any drilling on Geotek 69-1 properties which was commenced before the property had been transferred, the evidence further shows that such drilling was done, not in order to deceive investors or to benefit Jack Burke personally, but only to preserve the leases under which the properties had originally been acquired.

Anticipating an effective date for the Geotek 69-1 prospectuses prior to the actual effective date of September 15, 1969, Jack Burke and/or Fundamental had acquired properties for the Geotek 69-1 program in early 1969 under leases which required the drilling of wells prior to September, 1969.

The SEC next contends that the Jack Burke defendants failed to disclose that many of the properties individually, and all of the properties collectively, were acquired by Jack Burke and/or Fundamental at a cost substantially in excess of their fair market value.

As to this allegation, we find and conclude that the SEC has not established by a preponderance of the evidence that the properties, collectively or otherwise, were in fact acquired by Jack Burke and/or Fundamental at a cost in excess of their fair market value.

■ The SEC next contends that the Jack Burke defendants failed to disclose that the transfer of the properties to Geotek 69-1 was "wholly at the whim of Jack Burke."'

As to this allegation, we find and conclude that the Geotek basic documents and the Geotek 69-1 financial statement adequately disclosed that Jack Burke would be and was primarily, if not exclusively, responsible for the acquisition of properties for the programs: The Geotek 69-1 *limited partnership agreement* provided that the general partner (GRF) would have full, exclusive and complete authority in the management and control of the business of the program and would have the power to acquire leases and other interests in oil or gas producing properties; the Geotek 69-1 *prospectus* disclosed that Jack Burke was the chief executive officer of the general partner and that he wholly owned the general partner through his ownership of GTR Management Company; the Geotek 69-1 *financial statement* disclosed the following:

"The partnership agreement provides for Geotek Resources Fund, Inc. (a wholly-owned subsidiary of GTR Management Company, Inc., which, in turn, is controlled by Mr. Jack P. Burke) to be the

general partner and for GTR Management Company, Inc., to be the manager of the Limited Partnership. The general partner shall have full, exclusive, and complete authority in the management and control of the business of the Limited Partnership and shall make all decisions affecting its business." (Exhibit 22, p. f-3, note 1).

 The SEC next contends that the Jack Burke defendants failed to disclose the dollar amount of "costs" which were charged to the Geotek 69-1 program as a result of the transfers.

As to this allegation, we find and conclude that the Geotek 69-1 financial statement did adequately disclose as line-item entries, the total dollar amount expended in both 1969 and 1970 for "intangible drilling costs" (including costs incurred on "producing wells" and "wells in progress"), and also the total dollar amount expended for "leasehold acquisitions", "leasehold costs and intangible drilling costs—dry holes", "tangible equipment and surface facilities", and "lease operating expenses". (Exhibit 22, p. f-2).

Accordingly, we find and conclude that there is insufficient evidence to show that the Jack Burke defendants fraudulently, intentionally or, under the circumstances of this case, negligently made any material misstatements or omissions with respect to these Geotek 69-1 property transfer transactions.

As to AY the SEC contends that AY knew or should have known of the Jack Burke defendants' failure to disclose these allegedly material facts and, therefore, that AY improperly certified the Geotek 69-1 financial statement.

We find and conclude as to AY that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, negligently made any material misstatements or omissions in connection with these transfers in certifying the Geotek 69-1 program financial statement.

As to AY, we further find that AY obtained an opinion letter dated March 29, 1971, from the Geotek 69-1 management's attorney (Lempert), representing that, where a transfer to a Geotek program was to be made at cost and where the affiliate-seller had no reason to believe that property has declined in value, such transfer could be made without a formal valuation report; and that the values of the properties actually transferred to Geotek 69-1 were not less than the costs incurred; and that the values had not declined between the time of the costs and the time of transfer. (Exhibit 918).

D. *Property Transfers from Geotek 69-1 to Geotek 70-2*

In 1970, the Geotek 70-1 and 70-2 programs acquired a number of properties from the Geotek 69-1 program, including two properties known as the "Ghana" and "Walker" prospects.

The Geotek 70-1 and 70-2 *prospectuses* defined "affiliates" as including GRF, GTR, any of their officers or directors, and any entities owned or partially owned, controlled or managed by GRF, GTR or any of their officers or directors. (Exhibits 14 and 15, p. 6). Those prospectuses also contained a provision identical to that contained in the Geotek 69-1 prospectus concerning the acquisition of properties from "affiliates". (See p. 745, *supra*).

Although the SEC does not challenge the authority for these property transfers, the SEC does challenge the adequacy of the disclosures which were made by the Jack Burke defendants in connection with the transfers.

 The SEC first contends that the Jack Burke defendants failed to disclose whether or not the prices at which the properties were transferred to Geotek 70-1 and 70-2 bore a reasonable relationship to the fair market value of the properties.

The evidence is to the effect that the property transfers from Geotek 69-1 to Geotek 70-1 or 70-2 were made at a price equal to their actual cost to Geotek 69-1 or to Jack Burke and/or Fundamental. Pur-

suant to the terms of the prospectuses, if the properties were transferred at a price not greater than their actual cost, there was no need to inquire into their fair market value.

We further find, however, that there is insufficient evidence to show that the market value of these properties at the time of their transfer had so declined from their value at the time they were initially purchased that the transfer price (i. e., their "cost") no longer bore any reasonable relationship to their market value.

■ The SEC next contends that the Jack Burke defendants failed to disclose the dollar amount of "costs" transferred to Geotek 70–2 in connection with these property transfers.

As to this SEC allegation, the evidence shows that the line-item entries in the Geotek 70–2 financial statement did fully disclose the dollar amounts expended for "costs"; i. e., "leasehold acquisitions", "intangible drilling costs", "tangible equipment and surface facilities", "lease operating expenses", "lease rentals", and "technical geological, geophysical and land expenses". (Exhibit 23, p. f–2). We find and conclude that this disclosure was adequate and that there is insufficient evidence to show that generally accepted accounting principles require a further breakdown of such costs for the purpose of a period-end receipts and disbursements statement.

■ The SEC next contends that the Jack Burke defendants failed to disclose that a "dry hole" was drilled on the "Ghana" prospect prior to the transfer of that property from Geotek 69–1 to Geotek 70–2 and prior to the effective date of the Geotek 70–2 program.

As to this allegation, we find and conclude that the Geotek 70–1 and 70–2 financial statements adequately disclosed that exploratory wells had been drilled on the transferred properties. Those financial statements contained the following disclosure:

"In 1970 the Limited Partnerships acquired interests in oil and gas prospects from a limited partnership formed in a prior year and from another company owned by Mr. Jack P. Burke, at their cost. Exploratory wells were drilled and abandoned in 1970 on some of these prospects. (Exhibit 23, p. f–4, note 2).

The evidence further shows that expert witness Flynn testified that, in view of the above-disclosure, the Jack Burke defendants were not obligated to disclose separately in the financial statements that a single dry hole had been drilled on the "Ghana" prospect prior to its transfer to Geotek 70–2. (Tr. 6437).

The SEC next contends that the Jack Burke defendants failed to disclose that the "Ghana" prospect had been abandoned by the Geotek 69–1 program management at or about the time it was transferred to Geotek 70–2, and that the screening costs incurred on the "Walker" prospect by Geotek 69–1 were charged to Geotek 70–2 *after* the Geotek 69–1 management had already decided not to acquire the "Walker" prospect.

As to these allegations we find and conclude that there is insufficient evidence to establish that the Geotek management had decided either to abandon the "Ghana" prospect or not to acquire the "Walker" prospect prior to the date of their transfer to Geotek 70–2.

■ The SEC next contends that the Jack Burke defendants failed to disclose that funds of Geotek 70–1 had been used to pay costs incurred in connection with the drilling of a well ("Madeley B"), in which neither Geotek 70–1 nor any future partnership had, or was to have, an interest.

As to this allegation, we note that it was not mentioned in the SEC's pretrial statement and was not litigated as an issue at trial. The SEC asserted this issue for the first time in an unsolicited post-trial brief. Accordingly, we consider the allegation to have been untimely and improperly raised. Further, to the extent that we are now able to ascertain the substance of the allegation, we find and conclude that it is not supported by the evidence as presented and introduced by the SEC at trial.

As to all of the above allegations insofar as they are brought against the Jack Burke defendants, we find and conclude that the evidence is insufficient to show that those defendants fraudulently, intentionally or, under the circumstances of this case, negligently made any material misstatements or omissions with respect to the affiliated property transfers from Geotek 69–1 to Geotek 70–1 and 70–2.

As to AY, the SEC contends that AY knew or should have known of the Jack Burke defendants' failure to disclose the above facts and, therefore, that AY improperly certified the Geotek 70–1 and 70–2 financial reports.

As to AY, we find and conclude that there is insufficient evidence to show that AY fraudulently intentionally or, under the circumstances of this case, negligently made any material misstatements or omissions in certifying the Geotek 70–1 and 70–2 program financial reports.

## III. LATE CLEARING CHECKS

█ The financial statements for the JB–66 and JB–68 programs (Exhibits 18 and 20) covered the period from each program's inception to the end of the succeeding year (i. e., in the case of JB–66, the 20½ month period from April 15, 1966 to December 31, 1967; and in the case of JB–68, the 16½ month period from July 18, 1968 to December 31, 1969). These financial statements covered the entire periods specified and were not broken down into separate calendar-year periods.

The SEC contends that, by issuing the above-mentioned combined calendar-year financial statements, the Jack Burke defendants failed to disclose and intended to conceal the fact that expenses actually incurred by the programs in the second year of operations were for tax purposes falsely reflected in the programs' books, by the use of back-dated checks, as having been incurred in the first year of operations.

As to AY, the SEC contends that AY knew or should have known that these combined-year financial statements were being used by the Jack Burke defendants to conceal from the tax authorities the fact that certain checks had been back-dated and, therefore, that AY not only should have refused to certify the JB–66 and JB–68 financial statements, but that AY should have resigned from its accounting engagement with the JB programs in order to disassociate itself from the Jack Burke defendants' allegedly illegal tax-evasion scheme.

As to this allegation, insofar as it is directed against the Jack Burke defendants, the evidence shows that even the SEC's own expert witness (Duchan) testified at trial that there is no specific requirement in any of the professional accounting literature relating to generally accepted accounting principles to the effect that financial statements must be broken down into single calendar-year periods, or that combined statements unfairly present the financial information contained therein. (Tr. 4505–6).

The evidence is further to the effect that, prior to receiving the audited combined-year financial statements challenged herein by the SEC, investors in the JB–66 and JB–67 programs received certain *un*audited statements which covered only the first calendar year of each program; that, in preparing the *audited* combined-year statements at issue, the *audited* statements were separated into single-year periods and compared to the *un*audited statements and, where there appeared to be any discrepancy, the *audited* statements issued to investors were separated into single-year periods (as with the JB–67 audited statement, which is not challenged by the SEC herein); that no such discrepancy was found in the JB–66 statements and, therefore, the *audited* statement was not separated into single-year periods; that no *un*audited JB–68 statement was ever issued and, therefore, the *audited* JB–68 statement was not separated into single-year periods.

Inasmuch as the SEC bases its challenge of the audited JB–66 and JB–68 statements upon its theory that the statements covered *combined-years in order to conceal a tax*

evasion scheme, we further note that the evidence shows that the Internal Revenue Service examined the JB–66 and JB–68 expenditures which the SEC contends were paid with back-dated checks and concealed by use of the combined-year statements, and that the IRS never took any action against the Jack Burke defendants for any violations of the tax laws.

Further, the SEC's own expert (Duchan) testified that an audited statement of the type challenged by the SEC "does not serve any purpose or relation to tax information" (Tr. 4443–4), and the evidence shows that investors in the JB programs received (in addition to the above-mentioned *audited* and *un*audited statements) certain separate ta*x* information concerning the tax deductions which were available to investors. These separate tax statements are not a subject of this litigation.

Finally, with respect to the specific expenditures which are challenged by the SEC as having been paid with back-dated checks, we find and conclude that there is insufficient evidence to establish that the expenditures were actually incurred in the second year of the programs.[7]

As to these allegations insofar as they are directed against the Jack Burke defendants, we find and conclude that there is insufficient evidence to establish that said defendants fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in the JB–66 or JB–68 audited financial statements with respect to late-clearing checks.

As to AY, we find and conclude that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, negligently made any material misstatements or omissions in certifying the JB–66 or JB–68 audited financial statements.

## IV. TRACY MOUNTAIN

The JB–64 program financial statement issued on October 11, 1966, and covering the period from February 28, 1964 to December 31, 1964, included a line-item entry of $150,-427 for "intangible drilling costs" incurred in connection with "production properties" (Exhibit 18a). The evidence is to the effect that approximately $100,000 of those costs were incurred in connection with one particular prospect, i. e., "Tracy Mountain".

The SEC contends that, as of the date of issuance of this JB–64 financial statement (October 11, 1966), the Jack Burke defendants knew that Tracy Mountain was not a "production" property and, therefore, that the JB–64 financial statement contained a material misrepresentation in that respect. In support of this contention, the SEC alleges that, as early as February, 1975, the JB–64 program management had decided to plug and abandon the first Tracy Mountain well and that certain documents filed prior to October 11, 1966 in the State of North Dakota (where Tracy Mountain is located) indicate that no production had yet resulted from the prospect.

As to AY, the SEC contends that AY knew or should have known of the Jack Burke defendants' improper classification of these costs and, therefore, that AY improperly certified the JB–64 financial statement.

The evidence with respect to these allegations is that a "production property", as that term is defined, used, and understood in the oil, and gas industry, includes, not only those properties which are actually producing, but also those properties with

---

7. We find, for example, that the funds for the expenditures were disbursed by the programs to Fundamental during the first calendar year of the respective period and, therefore, that insofar as individual investors (as income tax payers) were concerned, the expenditure had arguably been incurred during that first year, regardless of Fundamental delay in forwarding the disbursement to the ultimate creditor; also, that the services for which Fundamental was being reimbursed could well have been rendered and incurred by Fundamental in the first calendar year (the year in which the checks were drawn), even though in some cases invoices for the services might not have been issued by Fundamental until early in the succeeding calendar year.

respect to which, based on some available information, there is a reasonable prospect of oil or gas production in commercial quantities.

The evidence is further to the effect that a first well was begun on the Tracy Mountain property on October 27, 1964, and a "good show of oil" was found; that oil was never actually produced from this first well, and in February, 1965, it was discovered that the cement casing in that well had failed; that in October, 1965, unsuccessful attempts were made to repair the casing; that in August, 1966, operations on this first well were suspended and a valve permitting the future re-opening of the first well was installed, pending the start of a nearby second well on the Tracy Mountain property; that, on October 24, 1966, drilling was commenced on this second well, but it was found to be "dry"; that it was not until November, 1966, that the second well was closed and it was not until October, 1967, that the first well was finally plugged and abandoned.

As to these allegations insofar as they are brought against the Jack Burke defendants, we find and conclude that there is insufficient evidence to show that said defendants fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in the JB–64 financial statement with respect to the Tracy Mountain property.

As to AY, we find and conclude that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, negligently made any material misstatements or omissions in certifying the JB–64 program financial statement.

As to AY, the evidence further shows that AY examined the invoices from the independent drillers of Tracy Mountain; that those invoices indicated that the costs charged therein were "completion costs", including construction of a cement casing, which further indicated that actual production was expected; that this information was consistent with management representations to AY to the effect that, although

there had been no actual production as of September, 1966, there were estimated reserves of 400,000 barrels—sufficient, not only to recover costs, but also to produce $13 million by 1985.

## V. OVERHEAD EXPENSES

### A. *Allocation of Overhead for 1970*

The Geotek *management agreements* provided that GTR, as manager of the programs, was to "charge the Partnership account with its proportionate share of technical, administrative and overhead expenses, direct and indirect, incurred [by GTR] in managing the partnership's capital . . . ." (Exhibits 12–17, § 2.3, p. B–2).

The Geotek *prospectuses* provided that GTR, as manager, would be reimbursed by the programs for ". . . all expenses incurred by it or paid to others for services performed for the Limited Partnership account, which may include various professional and administrative services, *including an allocated share of indirect expenses, provided by the staff of [GTR]*" (emphasis added). (Exhibits 12 and 13, pp. 5 and 11; Exhibits 14 and 15, pp. 2 and 10).

At the end of 1970, management for the Geotek programs allocated among the three existing Geotek programs (69–1, 70–1 and 70–2) the indirect expenses which GTR had incurred during that year. The end result of this allocation was set forth in the March 31, 1971 financial statements for each of those three programs (Exhibits 22 and 23).

Each of these financial statements contained a footnote which set forth the basic management structure of the Geotek programs and restated the above-quoted provisions of the management agreements and prospectuses. (Exhibits 22 and 23, p. f–3, note 1). This footnote further provided: "Indirect costs are allocated on bases determined by the manager and the general partner. The manager and general partner believe that the bases for these charges are reasonable." Finally, the footnote included a line-item summary of the indirect expenses charged to the program, which summary was divided into four categories: (1)

technical, geological, geophysical and other indirect expenses; (2) intangible drilling costs; (3) dry hole costs; (4) general and administrative expenses.

■ The SEC contends that the Jack Burke defendants failed to disclose in the Geotek 69–1, 70–1 and 70–2 financial statements that the overhead allocation for 1970 was, in fact, "arbitrary" and not based upon any supportive documentation. Similarly, with respect to the Geotek 71–1 and 71–2 prospectuses, the SEC contends that the Jack Burke defendants failed to disclose therein that the overhead expenses for those programs *would be* arbitrarily allocated.

The evidence with respect to these allegations is to the effect that the only two experts who stated an opinion as to this issue (Flynn and Kocour) opined that the 1970 overhead allocation was reasonable and was *not* arbitrary (Tr. 6090–1, 6358–9, 6389, 6499–6500, 6504, 6507–9). The evidence also shows that the allocation was supported by considerable documentation.

As to these allegations insofar as they are directed against the Jack Burke defendants, we find and conclude, particularly in light of the footnote disclosures in the relevant financial statements, that there is insufficient evidence to show that said defendants fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions with respect to the allocation of overhead expenses to the Geotek programs in 1970.

As to AY, we find and conclude that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in certifying the Geotek 69–1, 70–1 or 70–2 financial statements.

B. *Classification of Charter Street Corporation's Expenses*

■ The Geotek *prospectuses* provided that Charter Street Corporation (the Geotek programs' "underwriter") would receive commissions on subscriptions at the rate of 7½% and would be reimbursed by GTR for that portion of Charter Street's operating expenses which were allocable to services performed in connection with the limited partnerships. (Exhibits 12–13, p. 2, n. 2).

The SEC contends that the Jack Burke defendants failed to disclose in the basic documents or in the financial statements that, in addition to the 7½% selling commission, other Charter Street "selling expenses" would be and were being charged to the Geotek 69–1, 70–1 and 70–2 programs, as "general and administrative" expenses.

As to AY, the SEC contends that AY knew or should have known of the Jack Burke defendants' failure to disclose this fact and, therefore, that AY improperly certified the financial statements.

We first conclude from a reading of the Geotek prospectuses that Charter Street was not limited to receiving only a 7½% commission, but that Charter Street was also entitled to reimbursement by GTR for its operating expenses and that GTR, in turn, was entitled to reimbursement for its operating expenses from the Geotek programs. The evidence is also to the effect that at least one of the expert witnesses (Flynn) testified that Charter Street's reimbursable operating expenses were of a type which could be and are typically classified as "general and administrative" expenses. (Tr. pp. 6086–6088).

Accordingly, as to the Jack Burke defendants we find and conclude that there is insufficient evidence to show that those defendants fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions with respect to Charter Street's expenses.

As to AY, we find and conclude that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in certifying the Geotek 69–1, 70–1 or 70–2 financial statements.

### C. Allocation of Charter Street Expenses to Geotek 69–1

The SEC also contends that the Jack Burke defendants failed to disclose in the Geotek 70–1, 70–2, 71–1 and 71–2 prospectuses that approximately $300,000 of Charter Street's expenses were arbitrarily allocated to a rescission offer made in March, 1970 and charged to the Geotek 69–1 program.

This SEC allegation, although contained in the complaint (Doc. No. 1, pp. 42–3 (¶ 73) and 50 (¶ 80)), was not set forth in the SEC's pre-trial statement and was not included as an allegation in either the SEC's opening statement or closing argument at trial. The allegation was asserted by the SEC for the first time in an unsolicited post-trial brief. Accordingly, we find the allegation to have been untimely and improperly raised. Further, to the extent that we are now able to ascertain the substance of the allegation, we find that it is not supported by the evidence as presented and introduced by the SEC at trial.

### D. Estimated 5% General and Administrative Expenses for Geotek 71–1 and 71–2

The Geotek 71–1 and 71–2 *prospectuses* provided that, "[w]hile it is not possible to predict accurately at this time the allocation of net proceeds, it is estimated that approximately . . . 5% [of such proceeds will be utilized] for general and administrative costs." (Exhibits 16 and 17, p. 3).

The SEC contends that the Jack Burke defendants failed to disclose in the Geotek 71–1 and 71–2 prospectuses that this 5% estimate for general and administrative expenses was not practicable and that general and administrative expenses for the Geotek 70–1 and 70–2 programs had actually been closer to 30% of the net proceeds.

As to AY, the SEC contends that AY knew or should have known of the Jack Burke defendants' failure to disclose these facts and, therefore, that AY should have withdrawn consent to the use of its certification of a GRF financial statement which was incorporated in the registration materials submitted to the SEC in connection with the Geotek 71–1 and 71–2 offerings.

The evidence with respect to this allegation shows that the financial statements for the Geotek 69–1, 70–1 and 70–2 adequately disclosed the total amount of general and administrative expenses for those programs (Exhibits 22 and 23); that there is insufficient evidence to show that the 5% estimate for Geotek 71–1 and 71–2 was other than a good faith estimate of general and administrative costs, made by management and its legal counsel, based upon certain new cost-cutting programs and an anticipated increase in the sale of partnership interests in the 1971 programs; that AY was justifiably entitled to rely upon such a good faith determination by management.

Accordingly, as to this allegation insofar as it is brought against the Jack Burke defendants, we find and conclude that there is insufficient evidence to show that those defendants fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in the Geotek 70–1, 70–2, 71–1 or 71–2 basic documents or financial statements.

As to AY, we find and conclude that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in certifying the financial statements, or that AY should have withdrawn its consent to the use of its certification of the GRF financial statement.

## VI. BANK LOANS

During the period from 1969 to 1970, Fundamental obtained three bank loans for which certain JB and Geotek program properties were pledged as security. The first of these loans was for $1.5 million and was obtained in the Fall of 1969 from the United California Bank (UCB). This first loan was paid off in December, 1969 and, thereafter, in February, 1970, a second loan for $1.5 million was obtained from UCB by

Fundamental. This second loan was ultimately paid off with the proceeds from a $2.5 million third loan which was obtained by Fundamental in June, 1970 from the Security Pacific National Bank.

### A. The JB Programs

 The SEC contends that the Jack Burke defendants should have disclosed the following facts in the JB–68 financial statement which was issued on September 26, 1970 and covered the period from July 19, 1968 to December 21, 1969: (a) that a JB–68 program property had been pledged in 1969 as collateral for the first UCB loan, which loan was not intended to, and did not, benefit the JB–68 program; (b) that the same JB–68 program property was again improperly pledged in February, 1970 as collateral for the second UCB loan; and (c) that numerous JB–68 program properties had been pledged in June, 1970 for the third loan.

As to AY, the SEC contends that AY knew or should have known of these facts and of the Jack Burke defendants' failure to disclose them and, therefore, that AY improperly certified the JB–68 financial statement.

With respect to the inclusion of one or more JB–68 properties in the pledges for the first two loans, there is no evidence that any JB–68 property was included in the security pledges for either of the loans for any fraudulent purpose. To the contrary, the evidence tends to show that only one such property was included in those pledges and that it was so included inadvertently, without actual knowledge of the fact that it had been pledged. The evidence is further to the effect that neither the first nor second loan was outstanding at the close of the period reported upon in the JB–68 financial statement (i. e., the first loan was obtained and paid off during the statement period, and the second loan was not obtained until after the close of the period), and that neither loan outstanding at the time the JB–68 statement was issued to the investors on September 24, 1970 (i. e., the first loan was paid off in late 1969 and the

second loan was paid off in June, 1970). Both loans were paid off without injury or loss to the JB–68 program.

With respect to the inclusion of JB–68 properties in the pledge for the third loan, we find and conclude that the evidence is to the effect that this loan *did* benefit the JB–68 program and, therefore, that such inclusion was not improper.

As to the Jack Burke defendants, therefore, we find and conclude that there is insufficient evidence to show that they fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in the JB–68 financial statement with respect to any of the three bank loans.

As to AY, we find and conclude that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in certifying the JB–68 financial statement.

As to AY, we further find and conclude that there is no evidence that AY had any knowledge or reason to know of the existence either of the first two loans, until February, 1971, when, during an investigation of the third loan, AY came upon documents relating to the two earlier UCB loans; that AY, therefore, had no knowledge at the time the JB–68 financial statement was issued that a JB–68 property had been pledged as collateral for those first two loans; that, even if that inadvertent pledge was found to be a material fact which the Jack Burke defendants should have disclosed in the September 26, 1970 JB–68 financial statement, the evidence is insufficient to show that AY, in February, 1971, should have issued any retroactive change in its certification of that JB–68 financial statement.

### B. The Geotek Programs

 The SEC further contends that the Jack Burke defendants should have disclosed the following facts in the Geotek 69–1, 70–1 and 70–2 financial statements

issued on March 31, 1971: (a) that proceeds collected from the sale of interests in Geotek 69–1 had been used to repay the first loan in December, 1969; (b) that Fundamental and Jack Burke had obtained a second loan in early 1970; and (c) that $1.5 million of the proceeds of the third loan had been used to repay the second loan.

As to AY, the SEC contends that, by February or March of 1971, AY knew or should have known of the above facts and of the Jack Burke defendants' failure to make adequate disclosures and, therefore, that AY improperly certified the March 31, 1971 financial statements for the Geotek 69–1, 70–1 and 70–2 programs.

The Geotek 69–1 *financial statement* contained the following disclosure with respect to the matter of bank loans:

"During 1970, Fundamental Oil (a company owned by Mr. Jack P. Burke) borrowed $2,500,000 from a bank for the purpose of continuing development of oil and gas properties under management by GTR Management Company, including those managed on behalf of the Partnership. This loan was reduced to $2,190,000 at December 31, 1970 after the application of proceeds from a sale of certain properties included in other programs.

Substantially all of the properties in which the 69–1 Partnership held an interest were included as collateral to secure the loan. The Management Company has allocated the proceeds from the loan to the entities it manages.

The terms of the loan agreement (as renegotiated subsequent to December 31, 1970) provide for payment on demand, or if no demand, payment as follows (net of $10,000 paid upon renegotiation): $5,000 due March 1 and April 1, 1971, $40,000 per month thereafter through October, 1971, and the unpaid balance ($1,930,000) due November 1, 1971. Interest is payable monthly on the unpaid balance at the rate of 3% per annum in excess of the

bank's prime rate for 90-day commercial loans." (Exhibit 22, p. F–4, n. 3).

The Geotek 70–1 and 70–2 financial statements contained the following disclosure with respect to the matter of bank loans:

"Subsequent to December 31, 1970, a property owned by Geotek Resources Fund 70–1 was pledged as collateral on a loan which was obtained principally for the benefit of a limited partnership formed in a prior year." (Exhibit 23, p. f–4, n. 3).[8]

The evidence with respect to each of the SEC's above-mentioned contentions is as follows: (a) that proceeds from the sale of interests in the Geotek 69–1 program were used to repay the first UCB loan, but that proceeds from the first loan had been used to develop properties which were ultimately transferred to the Geotek 69–1 program; (b) that, by the time the three financial statements in question were issued (on March 31, 1971), the second loan had already been paid off and, in effect, had been replaced by the third loan; (c) that the second and third loans directly affected only the JB and Geotek 69–1 program properties, and the third loan, which in effect replaced the second loan, was secured (with the one above-mentioned exception disclosed in the Geotek 70–1 and 70–2 financial statements) by properties belonging only to the JB and Geotek 69–1 programs.

In view of this evidence and in view of the disclosures contained in the Geotek 69–1, 70–1 and 70–2 financial statements, we find and conclude as to the SEC allegations insofar as they are brought against the Jack Burke defendants, that there is insufficient evidence to show that those defendants fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions with respect to the bank loans.

As to AY, we find and conclude that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, even negligently

---

8. As disclosed in the financial statements for Geotek 70–1 and 70–2, one Geotek 70–1 property was pledged as collateral on the third loan, which loan was primarily for the benefit of Geotek 69–1. (Exhibit 23, p. F–4, note 3).

made any material misstatements or omissions in certifying the Geotek 69–1, 70–1 or 70–2 financial statements.

The SEC further contends, as to AY, however, that AY knew or should have known by March, 1971 that a third bank loan had been obtained; that properties of Geotek programs "formed" and "to be formed" had been pledged as collateral for the loan; and that the nature of the collateral pledge was not disclosed in the Geotek 71–1 or 71–2 prospectuses. The SEC contends that, based upon this knowledge, AY should have withdrawn and withheld consent to the use of its certification of the GRF financial statement which statement and certification were incorporated in all the Geotek prospectuses.

As to this allegation, we note that the allegation was not raised as an issue in the SEC pre-trial statement or at trial. We nevertheless find and conclude as follows: that the Geotek 69–1, 70–1 and 70–2 financial statements did disclose that properties of two of the already "formed" Geotek programs (i. e., Geotek 69–1 and 70–1) had been pledged as collateral for the third loan; that there is insufficient evidence to show that properties for Geotek programs "to be formed" were also included in that pledge; and that, even if such properties of future programs "to be formed" were included, the pledge would not have created any liability for GRF—the entity as to which AY consented to the use of its certification in the Geotek prospectuses. Accordingly, we conclude that there is insufficient evidence to show that AY was obligated to withdraw its consent to the use of said certification.

VII. THE LOST CREEK–MILLION DOLLAR SHORTAGE TRANSACTION

 On June 1, 1970, Jack Burke transferred a property which he owned personally (i. e., the so-called "Lost Creek" property to the JB and Geotek 69–1 programs at a price resulting in a profit to Burke of approximately one million dollars. The financial details of this transaction, including the

fact that the transaction resulted in a substantial profit to Burke, were disclosed by the Jack Burke defendants in several different forms:

(1) The Geotek 71–1 and 71–2 *prospectuses* disclosed:

"Jack Burke is and has been an officer and a shareholder of companies which have acted as Operator for and supplied services and property to the prior programs and others. All such items have been furnished to the prior programs at cost without profit, except that on June 1, 1970, Mr. Burke sold to certain prior programs undivided oil and gas interests and producing wells on certain properties for $1,308,596. These sales were made at a price and otherwise in accordance with the above. These properties were evaluated for the sale by independent petroleum engineers at $4,506,785 in undiscounted future net revenues. These properties had been acquired by Mr. Burke at a net cost (to the date of sale) of $696,211." (Exhibits 16 and 17, p. 23).

(2) The March, 1971 form *10–K report* for Geotek 69–1 disclosed:

"On June 1, 1970, Mr. Burke sold to the 1969–1 program undivided fractional oil and gas interests and producing wells on certain properties for $421,006. These sales were made at a price and otherwise in accordance with the procedures set forth under the "Conflict of Interests" section referred to above. These properties were valued for the sale by independent petroleum engineers at $1,261,900 in undiscounted future net revenues. These properties had been acquired by Mr. Burke at a net cost (to the date of sale) of $194,939." (Exhibit 982A, Item 15).

(3) The May 31, 1972 *financial statements* for Geotek 69–1 disclosed:

"Effective June 1, 1970, Burke sold to Geotek 69–1 a portion of his interest in a lease (acquired by him in 1969) for $421,-006. At June 1, 1970, Burke's amortized cost of this interest was $228,679 (including $151,179 of intangible drilling costs) as shown by Burke's records made availa-

ble to Geotek 69–1." (Exhibit 22, p. f–4, note 2).

The SEC does not challenge the authorization for this transaction; nor does it claim that the price charged to the programs by Burke exceeded the property's fair market value. Rather, the SEC contends that the Jack Burke defendants failed to disclose in the basic documents for the Geotek 70–1, 70–2, 71–1 and 71–2 programs, or in the financial statements for those programs, that the purpose of selling the Lost Creek property at a profit to Jack Burke was to conceal a so-called "million dollar shortage" in Fundamental's accounts, which "shortage" represented funds which Jack Burke owed to Fundamental and which Fundamental in turn owed to Jack Burke and to the JB programs.

The evidence is to the effect that in May, 1970, Jacqueline Aldrich, acting as Fundamental's accountant, determined that Fundamental's accounts were "short" or "out of balance", by a total of approximately one million dollars; that, of this one million dollars, Aldrich determined that Fundamental owed approximately $500,000 to P–2000 (JB–64 through JB–67), $200,000 to Petroforce (JB–68) and $300,000 to Jack Burke's personal account; that this "shortage" was the result of unrecorded withdrawals made by Jack Burke from Fundamental; that, prior to Aldrich's discovery of this "shortage", Jack Burke had decided to transfer the Lost Creek property to the JB and Geotek 69–1 programs *at cost,* but that, following the discovery of the "shortage", Burke decided to sell Lost Creek *at a profit,* which profit was to be applied, not to himself, but in effect to Fundamental in order to offset in full any "shortages" owing to the programs which were attributable to Burke personally; that such a sale and application of the profit was effectuated in June, 1970.

In view of this evidence, we find and conclude that regardless whether Jack Burke wrongfully or fraudulently misappropriated program funds from Fundamental for his personal gain, the re-structuring of the Lost Creek transaction to enable Burke to make up an existing cash shortage in the accounts of Fundamental, which shortage was attributable to him, was a material fact which the Jack Burke defendants fraudulently and with intent to deceive failed to disclose, in violation of the federal securities laws.

The SEC raises no similar contention against AY with respect to this transaction and there is no evidence that AY, at the time it certified the financial statements, had or should have had any knowledge of the so-called "million dollar shortage."

## VIII. REMUNERATION TO JACK BURKE

The Geotek 71–1 and 71–2 program prospectuses provided that, during the 1969–70 fiscal year, no officer or director of Geotek Resources Fund or GTR received direct remuneration in excess of $30,000 from each company and, further, that for the fiscal year 1970–71, it was not expected that any director or officer of Geotek Resources Fund would receive direct remuneration from that company in excess of $30,000. (Exhibits 16 and 17, p. 13).

Without having urged the contention in its pre-trial statement, the SEC contends that the Jack Burke defendants misstated or failed to disclose in the Geotek 71–1 and 71–2 prospectuses that Jack Burke had actually received remuneration from GTR Management substantially in excess of $60,000 in the 1969–70 fiscal year.

As to AY, the SEC contends that, based upon its knowledge of this omission in the Geotek 71–1 and 71–2 prospectuses, AY should have withheld consent to the use of its certification of the financial statement of Geotek Resources Fund which was incorporated in those prospectuses and that AY should have withdrawn consent to the use of similar certifications which were incorporated in the Geotek 69–1, 70–1 and 70–2 prospectuses.

The evidence is to the effect that, in fiscal year 1969–1970, Jack Burke received $30,000 from GRF and $30,000 from GTR, and that he also received remuneration from *other* of his entities which were not

related to the Geotek programs (e. g., JB Oil Company, Washington Oil, etc.). His total remuneration from all such entities during that fiscal year was between $75,000 and $100,000.

Receipt by Jack Burke of $30,000 each from GRF and GTR as well as certain other sums from entities unrelated to the Geotek programs for fiscal year 1969–1970 was not contrary to the provisions of the Geotek 71–1 and 71–2 prospectuses.

Accordingly, as to the Jack Burke defendants, we find and conclude that there is insufficient evidence to show that said defendants fraudulently, intentionally or, under the circumstances of this case, negligently made any material misstatements or omissions with respect to Jack Burke's remuneration in fiscal year 1969–1970.

As to AY, we find and conclude that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in certifying the financial reports or that AY should have withheld consent to the use of its certification of GRF's financial statement.

## IX. FAILURE TO ISSUE REGULAR FINANCIAL STATEMENTS

The JB–64 and JB–65 offering circulars provided that "a year-end audited financial report", which would include detailed schedules for attachment to federal income tax returns, would be mailed to all investors (Exhibits 10A and 10B, p. 10), and the JB–68 program agreement provided that "a certified audit", prepared by an independent Certified Public Accountant, would be furnished by the JB Oil Company to investors "within 180 days after the close of each calendar year." (Exhibit 11–E, § 7.2).

▮ The SEC contends that the Jack Burke defendants did not timely provide the JB–64, JB–65 or JB–68 investors with such audited financial reports.

We find the evidence is as follows with respect to the preparation and mailing to investors of audited financial reports:

| Program | Statement Period | Date of Report | Date of Mailing | Ex. No. |
|---|---|---|---|---|
| JB–64 | 2/28/64 12/31/64 | 10/11/66 | 10/11/66 | 18a |
| JB–64 | 1/1/65 12/31/67 | 10/21/68 | 10/28/68 | 967 |
| JB–65 | 2/10/65 12/31/65 | 5/12/65 | 6/17/67 | 18b |
| JB–65 | 1/1/66 12/31/67 | 8/9/68 | date unknown | 115 |
| JB–68 | 7/18/68 12/21/69 | 9/8/70 | 9/24/70 | 20 |

With respect to the JB–64 and JB–65 programs, it is clear from the evidence that year-end audited financial reports were prepared and mailed to investors as represented in the offering circulars.

With respect to the JB–68 audited financial report, the evidence shows that report was not mailed to investors until approximately 260 days after the close of the calendar year. Although this late mailing was not in compliance with the 180 day limit in the JB–68 offering circular, we find and conclude that there is insufficient evidence to show that, at the time the 180 day representation was made in the JB–68 offering circular, the Jack Burke defendants intended not to comply with the representation. Nor is the evidence sufficient to show that those defendants then knew or should have known that they would fail to comply with the representation.

Accordingly, we find and conclude as to the Jack Burke defendants that there is insufficient evidence to show that they fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions with respect to the timely issuance of JB–64, JB–65 or JB–68 financial reports.

There is no SEC contention brought against AY with respect to the timely issuance of financial reports.

## X. FAILURE TO FURTHER AUDIT FUNDAMENTAL

▮ The SEC asserts a final claim only against AY. The SEC contends that, even

though AY was engaged only to certify the JB and Geotek receipts and disbursements financial statements, and was not engaged to audit any of the program-related companies, AY's certifications of the financial statements were improper because AY failed to perform a more thorough review of Fundamental's books and records. Even the SEC's own accounting experts, however, conceded that AY was not obligated under the circumstances of their actual engagement to perform a separate, formal, full audit of Fundamental. Their testimony was merely that AY should have done something "more" than it did.

In a separate but related contention, the SEC further claims that AY inadequately examined and unreasonably relied upon Fundamental's "internal accounting controls".

The evidence shows, however, that AY, in the course of its certification examinations of the individual program's receipts and disbursements financial statements, did extensively examine Fundamental's books and records, as well as Fundamental's internal controls.

In 1966, when AY commenced its certification audits of the JB–64 and JB–65 program financial statements, AY found that the internal accounting controls of Fundamental were so weak that it could not rely upon them to any great extent. For that reason, AY decided that, in checking Fundamental's books and records for transactions relating to the JB programs' receipts and disbursements, it would actually check not less than 90% of all such transactions. This it did until 1970.

By 1970, in addition to the JB–64 and JB–65 programs, six others had been added (JB–66, JB–67, JB–68, Geotek 69–1, Geotek 70–1 and Geotek 70–2). AY then decided that continuance of its detailed examination of Fundamental, involving as it did an actual check of 90% of all program-related transactions, had become unreasonable and impractical, as well as unnecessarily time-consuming and expensive. Accordingly, AY made a further examination of Funda-

mental's internal controls (as well as the internal controls of the JB Oil Company, GRF and GTR) and, finding the controls to have by that time improved, AY decided to alter its certification audit by checking all of Fundamental's transactions over $5,000 —including, not only the program-related transactions of Fundamental, but *all* Fundamental transactions of whatever nature. As to all of Fundamental's transactions for less than $5,000, AY decided to check them by utilizing a sampling process involving actual examination of somewhat less than 90% of those transactions.

Based upon this extensive examination by AY of Fundamental's books and records, we find and conclude that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in its certifications of the JB and Geotek financial statements with respect to the adequacy of its examination of the books and records of Fundamental.

The SEC further contends that AY should have refused to certify the JB and Geotek programs' financial statements because there was no disclosure to investors therein that Fundamental did not have a "general ledger."

As to this allegation, the evidence shows that, although Fundamental had no general ledger in the years prior to 1970, all the underlying journals and records for those years did exist and were available to AY and that, under those circumstances, even the SEC's own expert (TenEyck) testified that a general ledger would merely have been a convenience to AY in its examination of the financial statements and was not indispensable.

We find and conclude, therefore, that there is insufficient evidence to show that AY fraudulently, intentionally or, under the circumstances of this case, even negligently made any material misstatements or omissions in certifying the JB Geotek financial statements in the absence of a general ledger for Fundamental.